COAL EMPLOYMENT PROJECT, et al., Petitioners,

v.

Elizabeth Hanford DOLE, in her Capacity as Secretary of Labor, United States Department of Labor, Respondent.

No. 88–1708.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 11, 1989.

Decided Nov. 21, 1989.

---

John F. Colwell, Washington, D.C., with whom J. Davitt McAteer, was on the brief for petitioners. Betty Jean Hall, Michael H. Holland, Mary Lu Jordan and Michael Dinnerstein, Washington, D.C., also entered appearances for petitioners.

Carl C. Charneski, Atty. Dept. of Labor, with whom Dennis D. Clark, Counsel, Dept. of Labor, was on the brief for respondent. George R. Salem, Counsel, Dept. of Labor, also entered an appearance for respondent.

Before WALD, Chief Judge, BUCKLEY and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

**1.** Petitioners are a women miners group, a Wyoming hardrock miner, and a labor union.

**2.** 30 U.S.C. § 814(d)(1) states in part:
   If, upon any inspection of a coal or other mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds that, while the conditions

WALD, Chief Judge:

In this petition,[1] we are asked to rule on the validity of the single penalty assessment provision ("single penalty") authorized by regulations issued pursuant to the Federal Mine Safety and Health Act of 1977 ("Mine Act"), 30 U.S.C. §§ 801 *et seq.* (1982). The single penalty is a $20 civil fine imposed on mine operators for violations that are not serious and have been timely abated. If the single penalty is promptly paid, it is excluded from an operator's violation history for future penalty assessment purposes. Criteria and Procedures for Proposed Assessments of Civil Penalties, 30 C.F.R. §§ 100.3(c), 100.4 (1988). Because, however, we are not able to determine from the record before us whether the manner in which the single penalty is selected and administered is consistent with the Mine Act, we remand the record for appropriate amendment of the regulations.

## I. STATUTORY AND REGULATORY BACKGROUND

The Mine Act comprehensively regulates mine safety. It provides that the Secretary of Labor promulgate mandatory health and safety standards, 30 U.S.C. § 811(a), and that the Secretary's representatives frequently inspect underground and surface mines, *id.* § 813(a). If an inspector determines that a mine operator has violated the Mine Act or safety and health standards promulgated thereunder, he "shall ... issue" a citation and set a reasonable abatement period. *Id.* § 814(a). Under § 814(d), a mine inspector may also, when appropriate, include in the citation a finding of "unwarrantable failure ... to comply with ... mandatory health and safety standards."[2]

   created by such violation do not cause imminent danger, such violation is of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, and if he finds such violation to be caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in

Section 110(a) of the Mine Act, *id.* § 820(a), provides that the operator of a coal or other mine in which a violation of a mandatory health or safety standard occurs "shall be assessed a civil penalty by the Secretary" not to exceed $10,000.[3] The Secretary is required to notify the operator of the civil penalty, *id.* § 815(a), and the operator may contest the penalty that the Secretary proposes to assess before the Federal Mine Safety and Health Review Commission, *id.* § 815(d), and ultimately before this court, *id.* § 816(a). If the operator does not contest the penalty, the proposed assessment becomes a final order. *Id.* § 815(a). Section 110(i) of the Act, *id.* § 820(i), lays out substantive guidelines for the penalties:

> The [Federal Mine Safety and Health Review] Commission shall have authority to assess all civil penalties provided in this chapter. In assessing civil monetary penalties, the Commission shall consider the operator's history of previous violations, the appropriateness of such penalty to the size of the business of the operator charged, whether the operator was negligent, the effect on the operator's ability to continue in business, the gravity of the violation, and the demonstrated good faith of the person charged in attempting to achieve rapid compliance after notification of a violation. In proposing civil penalties under this chapter, the Secretary [of Labor] may rely upon a summary review of the information available to him and shall not be required to make findings of fact concerning the above factors.

The Mine Act authorizes the Secretary to issue "such regulations as [she] deems ap-

propriate" to carry out any provision of the Act. *Id.* § 957. Thus, the Secretary has very broad discretion to devise a scheme implementing the Act's civil penalty guidelines.

On May 21, 1982, the Secretary of Labor, acting through the Mine Safety and Health Administration (MSHA), published "Criteria and Procedures for Proposed Assessment of Civil Penalties," 47 Fed.Reg. 22,286–22,297 (1982) (regulations later codified at 30 C.F.R. § 100.1 *et seq.*). These regulations lay out three methods of calculating civil penalties: the regular assessment, the special assessment, and the single penalty assessment at issue here. The regular assessment "is an administrative mechanism used by MSHA to determine the appropriate penalty by applying the statutory criteria to the particular facts surrounding a violation." 47 Fed.Reg. 22,287. This method, which was established in 1978, 43 Fed.Reg. 23,514–23,519 (1978), and modified slightly in 1982, 47 Fed.Reg. 22,287, 22,294–22,296, allocates points according to the penalty criteria of § 820(i); the size of the penalty increases with the number of penalty points incurred. *See* 30 C.F.R. § 100.3(g).[4]

The special assessment, which was also originally established in 1978, 43 Fed.Reg. 23,516, 23,519, and somewhat modified in 1982, 47 Fed.Reg. 22,292, 22,296, is designed for particularly serious or egregious violations. MSHA "may elect" to apply the special assessment in a number of situations, including violations involving fatalities or serious injuries, an imminent danger, or an operator's "[u]nwarrantable fail-

any citation given to the operator under this chapter.

**3.** Section 110(a), 30 U.S.C. § 820(a), states in full:

The operator of a coal or other mine in which a violation occurs of a mandatory health or safety standard or who violates any other provision of this chapter, shall be assessed a civil penalty by the Secretary which penalty shall not be more than $10,000 for each such violation. Each occurrence of a violation of a mandatory health or safety standard may constitute a separate offense.

**4.** Thus, under the regular assessment as modified in 1982, the operator's size may account for 0–15 points, history of previous violations for 0–20 points, operator's negligence for 0–25 points, and gravity of the violation for 0–30 points. Ten points are assigned if the operator does not abate the violation in the time set by the inspector, but the proposed penalty is reduced by 30% if the violation is timely abated. Unless information to the contrary is presented by the operator, MSHA assumes that the operator's ability to continue in business is not adversely affected by the payment of the penalty. 30 C.F.R. § 100.3(b)–(h).

ure to comply with mandatory health and safety standards." 30 C.F.R. § 100.5. MSHA's Program Policy Manual lists a number of factors that an inspector should "look for when making an unwarrantable-failure-to-comply determination," including "whether the violation is repetitious of a previous violation." Department of Labor, Mine Safety and Health Administration, Program Policy Manual, Vol. I, § 104, at 16 (July 1, 1988) [hereinafter MSHA Manual] (reprinted as Addendum C to Brief for Secretary of Labor (Resp. Br.)).[5] Once MSHA decides to impose a special assessment, it must consider the statutory criteria applied in the regular assessment. 30 C.F.R. § 100.5.

The single penalty assessment was first established in 1982. 30 C.F.R. § 100.4 provides:

> An assessment of $20 may be imposed as the civil penalty where the violation is not reasonably likely to result in a reasonably serious injury or illness, and is abated within the time set by the inspector. If the violation is not abated within the time set by the inspector, the violation will not be eligible for the $20 single penalty and will be processed through either the regular assessment provision (§ 100.3) or special assessment provision (§ 100.5).

30 C.F.R. § 100.3(c), laying out guidelines for taking into account a history of previous violations in the regular assessment, states in part:

> ... [V]iolations which receive a single penalty assessment under § 100.4 and are paid in a timely manner will not be included in the computation.

According to MSHA, the single penalty was developed "to permit the mining community to focus its resources on those violations which have the greatest impact on miner safety and health." 47 Fed.Reg. 22,-291. MSHA stressed the role of this provision in encouraging mine operators promptly to abate violations and pay their penalties. *Id.*

In its preamble to the single penalty, MSHA explained that its inspectors determine whether a violation is serious by first evaluating whether an injury or illness is reasonably likely to occur if the violation is not corrected. Next, the inspector considers whether such an injury or illness, if it did occur, would be reasonably serious. If the inspector concludes that the violation is not reasonably likely to result in a reasonably serious injury or illness, the single penalty applies and a "summary review and analysis of the condition or practice" surrounding the violation is conducted:

> ... [W]hen the gravity factor is low and good faith is established through abatement, MSHA does not believe that an individualized analysis of the negligence, size and history criteria is appropriate or necessary.

47 Fed.Reg. 22,292. Through such non-individualized analyses, MSHA hoped that the single penalty would "eliminat[e] the need to spend disproportionate amounts of time reviewing and processing violations whose impact on safety and health is minimal." *Id.*

The non-individualized analysis of degree of negligence, company size, and violation history is the crux of the dispute about the validity of the single penalty. Petitioners claim that § 820(i) requires individualized consideration of each of the six criteria listed there in the assessment of every civil penalty. Since the single penalty, by its terms and in its application, eliminates individualized consideration of several criteria, petitioners argue that it violates the statutory command. Brief for Petitioners (Pet. Br.) at 11. Alternatively, petitioners suggest, even if the Mine Act permitted a non-individualized application of certain criteria, it nevertheless requires that every penalty assessment "be counted in a mine operator's history of previous violations." *Id.* at 11–12. In contrast, respondents maintain that the Mine Act does not require individualized consideration of each

---

5. We recognize that the MSHA Manual may not be binding on the agency. *See Vietnam Veterans of America v. Secretary of the Navy,* 843 F.2d 528, 536–38 (D.C.Cir.1988); *Brock v. Cathe-* *dral Bluffs Shale Oil Co.,* 796 F.2d 533, 536–39 (D.C.Cir.1986). Nonetheless, we consider the MSHA Manual to be an accurate guide to current MSHA policies and practices.

criterion. The single penalty is valid, they contend, because it does take into account each of the statutory factors, albeit not in a company-specific manner. Resp.Br. at 8.

## II. ANALYSIS

### A. *The Appropriate* Chevron *Analysis*

We begin by identifying the proper standard for our review of the single penalty. We determine first whether the regulation is consistent with the statute. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). This involves an initial inquiry into "whether Congress has directly spoken to the precise question in issue." *State of Ohio v. United States Dep't of the Interior*, 880 F.2d 432, 441 (D.C.Cir.1989) (quoting *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). "If the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *K Mart*, 108 S.Ct. at 1817 (quoting *Board of Governors, FRS v. Dimension Financial Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 685, 88 L.Ed.2d 691 (1986); *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781). In other words, the regulation must incorporate the precise congressional intent, if it is ascertainable. Whether Congress' intent is clear and unambiguous depends, of course, not only on the particular statutory language at issue but also on "the language and design of the statute as a whole." *K Mart*, 108 S.Ct. at 1817. If, after employing traditional tools of statutory construction, including text, structure, and legislative history, the court reaches the "unmistakable conclusion that Congress had an intention on the precise question at issue, 'that intention is the law and must be given effect'" in the regulation. *State of Ohio*, 880 F.2d at 441 (quoting *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9). This is commonly referred to as a *"Chevron I"* analysis.

If, however, the statute is ambiguous or silent on the "specific issue addressed by the regulation," we proceed to a second inquiry directed at whether the agency's regulation is "a permissible construction of the statute." *K Mart*, 108 S.Ct. at 1817. The court must defer to the agency's interpretation so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language. *Id.; State of Ohio*, 880 F.2d at 441. This is our *"Chevron II"* analysis.

We conclude that the *Chevron II* standard is applicable in this case because we find the Mine Act and its legislative history to be silent as to whether individualized consideration of each of the six criteria of § 820(i) is necessary in the case of every civil penalty assessment, including the single penalty. While we believe that the Act plainly requires the Secretary, when assessing penalties, not to exclude any of these criteria—and, in particular, to consider an operator's history of previous violations—we do not read the statute on its face to mandate specific formulas or methodologies for taking account of the criteria.

Petitioners contend that the phrase "appropriateness of *such* penalty," 30 U.S.C. § 820(i) (emphasis added), and the description of the six penalty factors as "those *upon which* the Secretary shall propose a civil penalty," S.Rep. No. 461, 95th Cong., 1st Sess. 58 (1977) (emphasis added), *reprinted in* Subcomm. on Labor of Senate Comm. on Human Resources, 95th Cong., 2d Sess., *Legislative History of the Federal Mine Safety and Health Act of 1977* 1336 (Comm.Print 1978) [hereinafter *1977 Legislative History*], indicate that Congress meant the criteria to be individually considered for each and every brand of penalty assessed. Pet.Reply Br. at 4. While we agree with petitioners that the cited language shows that Congress intended MSHA to base all of its penalties on consideration of all of the statutory factors, we do not find that this same language instructs the Secretary to devise a penalty scheme that adopts an individualized approach to all six penalty criteria. In the absence of a more precise statement of intent on the question, we are thrust into a *Chevron II* analysis, under which we defer to the Secretary's interpretation of the

Mine Act, so long as that interpretation is reasonable.

### B. *Application of* Chevron II *to This Case*

Even in the absence of precise guidance from the statute's text and structure on the question of individualized application of the six statutory criteria, we consult relevant language, structure, and legislative history to ensure that the Secretary's interpretation "is arguably consistent with the underlying statutory scheme in a substantive sense"; we must also determine "whether 'the agency considered the matter in a detailed and reasoned fashion.'" *Rettig v. Pension Benefit Guaranty Corp.*, 744 F.2d 133, 151 (D.C.Cir.1984) (quoting *Chevron*, 467 U.S. at 865, 104 S.Ct. at 2793 (footnote omitted)). We now undertake this inquiry with respect to the single penalty.

### 1. *Relevant Congressional Concerns*

Congress' overriding concern in passing the Mine Act was to promote miners' health and safety in the wake of several mine disasters. 30 U.S.C. § 801(a) (mine industry's "first priority ... must be the health and safety of ... the miner"). To remedy unsafe mines, Congress maintained and upgraded the civil penalty scheme of the Federal Coal Mine Health and Safety Act of 1969 ("Coal Act") in order to "induce those officials responsible for the operation of a mine to comply with the Act and its standards." S.Rep. No. 181, 95th Cong., 1st Sess. 41 (1977), U.S.Code Cong. & Admin.News 1977, pp. 3401, 3441, *1977 Legislative History* at 629. Indeed, the sponsor of the 1977 Mine Act singled out the civil penalty as "the mechanism for encouraging operator compliance with safety and health standards." 123 Cong.Rec. 4388 (1977), *1977 Legislative History* at 85. The Senate Committee on Human Resources found that "civil penalty assessments are generally too low," S.Rep. No. 181, at 41, U.S.Code Cong. & Admin.News 1977, at 3441, *1977 Legislative History* at

629, to provide an effective inducement for mine operators to comply with the Coal Act and its standards. The Supreme Court as well has recognized that "[t]he importance of [the civil penalty provision] in the enforcement of the [Coal] Act cannot be overstated" because monetary penalties provide a "deterrence" that necessarily infrequent inspections cannot generate. *National Independent Coal Operators' Ass'n v. Kleppe*, 423 U.S. 388, 401, 96 S.Ct. 809, 816, 46 L.Ed.2d 580 (1976). Thus, Congress envisioned penalties that would "be of an amount which is sufficient to make it more economical for an operator to comply with the Act's requirements than it is to pay the penalties assessed and continue to operate while not in compliance." S.Rep. No. 181, at 41, U.S.Code Cong. & Admin.News 1977, at 3441, *1977 Legislative History* at 629; *see also* 123 Cong.Rec. 19,931 (1977), *1977 Legislative History* at 921.

Congress was particularly concerned about curbing repeat offenders among mine operators. Reporting on the bill that became the Mine Act, the Senate Committee on Human Resources stated:

> In evaluating the history of the operator's violations in assessing penalties, it is the intent of the Committee that repeated violations of the same standard, particularly within a matter of a few inspections, should result in the substantial increase in the amount of the penalty to be assessed. Seven or eight violations of the same standard within a period of only a few months should result, under the statutory criteria, in an assessment of a penalty several times greater than the penalty assessed for the first such violation.

S.Rep. No. 181, at 43, U.S.Code Cong. & Admin.News 1977, at 3443, *1977 Legislative History* at 631; *see also* 123 Cong.Rec. 19,931 (1977), *1977 Legislative History* at 922 ("greater stress is put on the repetitive nature of the violation"); 123 Cong.Rec. 20,027 (1977), *1977 Legislative History* at 1074–75.[6]

---

6. Congress also made withdrawal orders and injunctions available to the government to di-

sarm repeat offenders. 30 U.S.C. §§ 814(e), 818(a)(2).

From this history, we conclude that Congress was intent on assuring that the civil penalties provide an effective deterrent against all offenders, and particularly against offenders with records of past violations. Thus, despite the Secretary's unchallenged broad discretion in devising an effective penalty scheme, the civil penalty regulations must not run contrary to that intent.

### 2. *Reasonableness of the Single Penalty in Light of These Concerns*

We now proceed to assess the petitioners' objection to the single penalty against the backdrop of Congress' intent to create an effective civil penalty scheme to deter repeat offenders.

### a. *Failure of the Mine Act to Provide* De Minimis *Penalties*

Petitioners argue that neither the Mine Act nor its supporters envisioned uniform *de minimis* penalties for low-gravity, timely-abated violations. They point in contrast to the Occupational Safety and Health (OSH) Act, 29 U.S.C. §§ 651 *et seq.* (1982), which statutorily provides for different levels of civil penalty maxima depending on whether the violation was "willful or repeated," "serious," or "not serious." *Id.* §§ 666(a)–(c). The OSH Act also authorizes the Secretary of Labor to issue a notice in lieu of a citation with respect to certain *de minimis* violations. *Id.* § 658(a). Absent any similar authorization in the Mine Act, petitioners claim that assessing the same $20 penalty for all low-gravity, timely-abated violations runs so contrary to the congressional purpose as to fall short of even the relatively relaxed *Chevron II* threshold of reasonableness. *See* Pet.Br. at 18–20; Pet.Reply Br. at 9–10.

We disagree with that conclusion for several reasons. First, Congress indisputably left the actual size of all penalties, up to a maximum of $10,000, to the Secretary's discretion. Second, even under the "regular assessment," a one-time, timely abated low-gravity penalty would probably incur a fine of around $30. *See* 30 C.F.R. § 100.3(f), (g) (applying penalty conversion table, with possible 30% reduction for timely abatement). Thus, the single penalty, which inevitably saves agency time and paperwork, would yield nearly the same result as a regular assessment in the bulk of cases involving minor infractions. *See generally* Part II.B.2.b, *infra.*

Petitioners also point to the Senate Human Resources Committee's

> intention that the unwarranted failure citation is appropriately used for all violations, whether or not they create a hazard which poses a danger to miners[,] as long as they are not of a purely technical nature. The Committee assumes, however, that when "technical" violations do pose a health or safety danger to miners, and are the result of an "unwarranted failure" the unwarranted failure notice will be issued.

S.Rep. No. 181, at 31, *1977 Legislative History* at 619. Petitioners argue on the basis of this Report that Congress was willing to countenance a *de minimis*-type penalty only for violations that pose no threat of injury to the miner—a much narrower category than violations that are not reasonably likely to result in a reasonably serious injury, the classification now covered by the single penalty. Pet.Br. at 18–19. We find this reasoning problematic, however, because even under the cited language, the occurrence of a low-gravity violation that is timely abated is not automatic proof that the operator unwarrantably failed to comply with appropriate standards. The MSHA Manual indicates that a failure to comply is unwarrantable only if the operator was engaging in "aggravated conduct constituting more than ordinary negligence." MSHA Manual, Vol. I, § 104(d), at 16. Clearly, not all non-technical violations involve such extraordinary negligence. Furthermore, the cited language appears in the context of the Committee's approval of the Board of Mine Operation Appeals' decision minimizing the gravity of a violation necessary for it to be classified as "significant and substantial." Thus, we understand the Committee to say that an unwarrantable failure citation is a remedy available to an inspector confront-

ing a non-technical violation that involves unwarrantable behavior, such as the operator's deliberate or repetitious violation of a health or safety standard. We do not believe that the Committee concluded that every violation except the no-risk "technical" one requires an unwarrantable failure citation.

### b. Non–Individualized Consideration of Mandatory Factors

The petitioners' principal argument is that MSHA acted unreasonably in construing the statute to permit non-individualized treatment of the six statutory criteria in the single penalty. We do not agree.

Respondents maintain that the Secretary considered all six factors before devising the three assessment formulas. She then determined that in cases of low-gravity violations that are timely abated, the other four penalty criteria—negligence, violation history, operator size, and effect on the operator's ability to stay in business—are insufficiently relevant to warrant consideration on a violation-by-violation basis. MSHA acknowledges that a penalty assessment formula that disregards or excludes any of the statutory factors would be impermissible, Resp.Br. at 14 n. 9, but insists that a non-individualized penalty assessment formula reasonably reflects congressional intent in the Mine Act.

We determine first that, as a general matter, the assessment of penalties according to group classifications based on the presence or absence of specific criteria is a reasonable interpretation of the Mine Act. We then consider whether the Secretary could reasonably have made such across-the-board determinations for operator size, negligence, and violation history, or whether the non-individualized consideration of any of those factors amounts to its exclusion. If MSHA's justification for the non-individualized consideration of these factors is reasonable, our inquiry is ended, and we must deny the petition for review. If MSHA's justification is not reasonable, non-individualized consideration of the factors would be tantamount to their exclusion, which, by MSHA's own interpretation of the Mine Act, is inconsistent with the

statutory command and would therefore necessitate modification of the civil penalty regulations.

(1) *General Considerations.* We recall that § 110(i) of the Mine Act, 30 U.S.C. § 820(i), provides in part:

> In proposing civil penalties under this chapter, the Secretary may rely upon a summary review of the information available to him and shall not be required to make findings of fact concerning the above [six] factors.

At a minimum, this statement indicates that Congress did not intend for MSHA to engage in a full-scale fact-finding on each criterion in every case before designating a penalty. MSHA's decision to direct its energies to "conditions which pose a serious risk to the safety and health of miners" by applying the single penalty to low-gravity, timely-abated violations, 47 Fed. Reg. 22,292, does not seem unreasonable or inconsistent with this directive. Although there was strong support in Congress for using the civil penalties as a deterrent against operator violations, little discussion focused on the penalty formulas that could most effectively accomplish the deterrence objective.

The ultimate goal of MSHA's enforcement scheme is the permanent abatement of substandard mine conditions and practices. Once abatement occurs, the size of the civil penalty is relevant only as a means of deterring repeat violations. Since the violations involved in the single penalty are not reasonably likely to cause reasonably serious harm, even successful deterrence of these violations will not significantly reduce a miner's risk of serious illness or injury. Thus, we conclude that so long as they appropriately take account of the statutory criteria and principal congressional purposes, non-individualized determinations are properly within the Secretary's discretion.

(2) *Operator size.* We agree with MSHA that the single penalty reasonably accounts for operator size. To "ensure the greatest degree of consistency" in applications of the Mine Act, 43 Fed.Reg. 23,514

(1978 implementation of Mine Act civil penalty scheme), the regular and special assessments increase the assessed penalty as the size of the operator or its parent company grows. As MSHA explained, stiffer penalties against larger mines are necessary, at least in part, to ensure that operators of mines with more complex management structures would notice and correct violations. *Id.* at 23,515 ("penalties must be such as to encourage management at all levels to respond positively to health and safety concerns").

It seems reasonable, however, for MSHA to determine that the single penalty should be the same regardless of the operator's size. Clearly, MSHA has a valid interest in promoting the efficient use of its own resources. We think it permissible for MSHA to adopt non-individualized standards of operator size in order to improve the agency's efficiency, even at the risk of losing the marginal deterrence that would accompany the higher penalty likely to result from a company-by-company evaluation of this criterion. *See* 47 Fed.Reg. 22,-287–22,288.[7]

(3) *Negligence.* We also agree with MSHA that the single penalty reasonably accounts for negligence. A mine operator observes the regulatorily mandated "high" standard of care owed to miners by being "alert for conditions and hazards in the mine which affect the safety or health of the employees and ... [by] tak[ing] the steps necessary to correct or prevent such conditions or practices." 30 C.F.R. § 100.3(d). The type of violation at issue in a single penalty assessment—one not reasonably likely to result in a reasonably serious injury or illness—involves an inherently limited amount of negligence. While a mine operator who acts at the mandated level of care will, presumably, not commit any violations, an operator incurring a single penalty is, by definition, only slightly negligent. Even under an individualized assessment, the negligence involved in a violation leading to a single penalty would not add substantially to the total fine.[8] It is plausible, therefore, that MSHA's efficiency gains from non-individualized treatment of negligence outweigh the deterrence benefits that individualized consideration of that criterion might generate.[9]

We think MSHA's approach is reasonable even if a violation leading to a single penalty is reasonably likely to result in non-seri-

7. Aside from the penalty's effect on the operator's ability to continue in business, the operator's size generally receives less weight than the other factors in the regular assessment. *See* 30 C.F.R. § 100.3. This suggests that MSHA consistently places less weight on operator size than on most other criteria, regardless of the assessment formula used.

MSHA presumes that the effect of the penalty on the operator's ability to continue in business is of negligible import even under the regular assessment, since under that scheme the operator must affirmatively offer evidence of the effect that the penalty would have. 30 C.F.R. § 100.3(h). We see no. reason why that presumption should also not operate in the single penalty context.

8. Suppose a one-time low-gravity, timely-abated violation were considered under the regular assessment, rather than under the single assessment. Adding seven penalty points for low negligence (ten points less a 30% rebate for timely abatement) to the penalty for such an infraction would probably not increase the total penalty by more than $15 or $20; at low penalty levels, additional points do not substantially increase the total penalty. *See* 30 C.F.R. § 100.3(d), (g).

9. Our analysis is based on MSHA's statement that when violations are of low gravity and are timely abated, "MSHA does not believe that an individualized analysis of the negligence ... criteri[on] is appropriate or necessary." 47 Fed. Reg. 22,292; *see* page 1130, *supra.* In its brief, however, MSHA suggests that it actually conducts an individual assessment of negligence because, when reviewing specific violations, an inspector determines whether there has been an "unwarrantable failure to comply" based in part on whether the operator has acted with "more than ordinary negligence." Resp.Br. at 8–9; *see* MSHA Manual, Vol. I, § 104(d), at 16. Since the Mine Act authorizes unwarrantable failure citations only when the violation in issue "could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard," 30 U.S.C. § 814(d), MSHA's claim could not extend to negligence involved in violations that do not have this significant and substantial effect—precisely the violations covered by the single penalty. *See* Part II.B.2.b.4, *infra.*

ous injury.[10]  In such a case, although the operator may be alert to serious violations affecting mine safety, he would be negligent vis-a-vis potentially less harmful violations.  It is credible, however, for MSHA to argue that because the likely harm is minor, the operator did not fall far short of his overall duty of care and that his total negligence was minimal.  While repeated non-serious injuries may call for a higher negligence finding because they suggest that the operator failed to correct the problem, the violation history criterion provides a more accurate vehicle than the negligence criterion for weighing past non-serious injuries in the penalty calculation.  Consequently, MSHA can properly rely on a non-individualized negligence determination.

(4) *Violation History.*  We have seen that the operator's violation history was an especially important criterion in Congress' eyes.  *See* Part II.B.1, *supra.*  It figures in an evaluation of the validity of the single penalty in two ways: its presence or absence in the single penalty assessment itself, 30 C.F.R. § 100.4, and the omission of single penalty assessments from an operator's past history of violations in applications of the regular and special assessment formulas, 30 C.F.R. §§ 100.3(c), 100.5.  To aid in deciding whether the single penalty's non-individualized treatment of violation history is a reasonable approach to deter repeat violators or creates an unreasonable loophole in the Mine Act, we examine two relevant scenarios—first, operators who commit and abate a series of violations that could not "significantly and substantially contribute to the cause and effect of a … mine safety hazard," 30 U.S.C. § 814(d),[11]

("Case 1"), and second, operators who commit a significant-and-substantial violation after committing and abating a series of non-significant-and-substantial violations ("Case 2").[12]

(a) *Case 1.*  Congress' decision to include violation history as one statutory criterion implies—as the regular assessment generally reflects—that the more infractions previously incurred, the higher the current penalty should be.  30 C.F.R. § 100.3(c).  There is no evidence that Congress did not mean this approach to apply to the violations governed by the single penalty.  We are, therefore, troubled by the scenario of a mine operator committing a series of non-significant-and-substantial violations of mandatory standards, abating the problems, and incurring only a string of $20 penalties.  Respondents answer that in such a situation, MSHA would not repeatedly issue single penalties but would, instead, impose a higher special assessment on the grounds of the operator's "[u]nwarrantable failure to comply with mandatory health and safety standards."  Charneski Letter, at 2–3 (referring to 30 C.F.R. § 100.5(b)).

This response is not entirely satisfactory, however, because MSHA may issue an unwarrantable failure to comply citation only for significant-and-substantial violations of mandatory health and safety standards. 30 U.S.C. § 814(d).[13]  The single penalty itself, however, is applicable only to non-significant-and-substantial violations.  Accordingly, we do not see how a special assessment for an unwarrantable-failure-to-comply could be invoked in any case

---

**10.**  For example, it might be reasonably likely that a miner would stub his toe whenever he walked in a place that did not meet mine safety standards.

**11.**  For ease of exposition, we refer to violations that could "significantly and substantially contribute to the cause and effect of a … mine safety hazard" as "significant-and-substantial" violations.  The single penalty is imposed only on violations that are not significant-and-substantial.  *See Consolidation Coal Co. v. Federal Mine Safety and Health Review Comm'n,* 824 F.2d 1071, 1079 (D.C.Cir.1987); Letter of Octo-

ber 19, 1989 by Carl Charneski, MSHA Attorney, responding to Order of this court of October 12, 1989, at 3 nn. 3, 4 [hereinafter Charneski Letter].

**12.**  Neither Case 1 nor Case 2 is governed by § 104(e) of the Mine Act, 30 U.S.C. § 814(e), which authorizes issuance of a notice and, if necessary, a withdrawal order to a mine operator who engages in a pattern of significant-and-substantial violations of mandatory standards.

**13.**  *See supra* notes 2, 9.

where the present violation is not itself significant-and-substantial.[14]

Respondents also call our attention to the provision in the MSHA Manual stating that special assessments are "usually proposed" for "[n]on-significant-and-substantial violations that involve an extraordinarily high degree of negligence and a history of the same type of violation at the mine." MSHA Manual, Vol. III, § 100.5, at 42 (reprinted as Attachment D to Charneski Letter). This provision appears to be an implementation of 30 C.F.R. § 100.5(h), which states that "[v]iolations involving an extraordinarily high degree of negligence or gravity or other unique aggravating circumstances" are individually reviewed to determine the appropriateness of a special assessment. Yet this policy also does not provide a vehicle by which MSHA can penalize a history of non-significant-and-substantial violations that each qualify for single penalty assessments.

First, the "extraordinarily high degree of negligence" standard is more severe than even the "aggravated conduct constituting more than ordinary negligence" that is necessary for unwarrantable failure citations. *See* MSHA Manual, Vol. I, § 104(d), at 16.[15] Even repeated non-significant-and-substantial violations of most mandatory standards are unlikely to involve this extreme degree of negligence. Second, although, in theory, Case 1 might constitute a "unique aggravating circumstance," we find no evidence that MSHA envisioned placing a series of non-significant-and-substantial violations in this category.[16] Third, while the records of

a mine operator's prior single penalty violations are available to district managers, MSHA is "unaware of published national instructions that require the district manager to specifically consult those records" in recommending the imposition of a special assessment. Charneski Letter, at 3. Thus, there is no guarantee that in Case 1, MSHA would consider a company's violation history.[17] We believe, however, that Congress intended that the penalty scheme promulgated by MSHA must take into account the operator's history of non-technical violations, regardless of whether they are significant-and-substantial or non-significant-and-substantial.

Additionally, we are troubled by MSHA's statement, in its discussion of the single penalty in the preamble to the civil penalty regulations, that "[s]ingle penalty violations which are paid in a timely manner will not be included in the operator's history." 47 Fed.Reg. 22,291. This comment seems markedly inconsistent with respondents' written and oral representations that MSHA does keep records of all past violations, and that district managers determine whether to levy a single or special assessment based in part on whether the operator committed past infractions that resulted in the single penalty. In short, MSHA's own regulations do not appear to provide a reasonable and consistent method for imposing higher penalties against operators who commit numerous non-significant-and-substantial violations. Without further explanation, we are forced to conclude that this

---

**14.** As petitioners point out, the special assessment is discretionary. 30 C.F.R. § 100.5 (MSHA "may elect" to impose special assessment). If MSHA decided not to impose a special assessment and the current repeat violation were again timely abated, it seems that MSHA would have to assess another $20 penalty and could not even impose a regular assessment.

**15.** Although "more than ordinary" negligence is, presumably, equivalent to "extraordinary" negligence, "extraordinarily high" negligence is, presumably, equivalent to "more than ordinarily high" negligence, which is greater than "more than ordinary" negligence.

**16.** In fact, as an example of "unique aggravating circumstances," the MSHA Manual suggests "not

taking appropriate measures to prevent the destruction of evidence or the falsifying of records," a type of misbehavior that is unrelated to conditions or practices in or around a mine that are reasonably likely to cause reasonably serious injury to miners. MSHA Manual, Vol. III, § 100.5, at 42.

**17.** In view of our doubts that MSHA's regulations allow the imposition of a special assessment in Case 1, we are equally concerned that if the operator had committed a series of significant-and-substantial violations, and had received an unwarrantable failure citation, and now committed a non-significant-and-substantial violation, MSHA would be unable to impose anything more than a single penalty against him.

regulatory failure runs so contrary to a principal purpose of the Mine Act as to render MSHA's regulation unreasonable.

(b) *Case 2.* The second scenario, a significant-and-substantial violation following a series of non-significant-and-substantial violations, is only slightly less troublesome. Although 30 C.F.R. § 100.3(c) states that timely paid single assessments "will not be included in the computation" of regular assessments, respondents represent that in Case 2, MSHA does consider the history of prior single penalties. If a significant-and-substantial violation of a mandatory standard occurs, the Mine Act authorizes an inspector to issue, when appropriate, an unwarrantable failure citation. 30 U.S.C. § 814(d)(1). And MSHA's Policy Manual suggests that if "the violation is repetitious of a previous violation," there may be "sufficient grounds" for an unwarrantable failure citation or order, MSHA Manual, Vol. I, § 104(d), at 16, for which a special assessment is "usually proposed," *id.*, Vol. III, § 100.5, at 41. Thus, if the significant-and-substantial violation is similar to the non-significant-and-substantial violations that preceded it, the offending operator is likely to incur a special assessment reflecting his pattern of violations. On the other hand, if the later violation is not "repetitious of" the earlier string of non-significant-and-substantial violations, MSHA's regulations and policies seem to imply that the later violation would generate only a regular assessment that does not reflect the earlier violations. Without further explanation by MSHA, we are again concerned that such a result would run contrary to the indications, discussed *supra*, that Congress intended to impose higher penalties on operators with a record of past violations.

### III. REMEDY

The penalty scheme in 30 C.F.R. §§ 100.-3(c), 100.4 does not appear to provide for consideration of the mine operator's violation record where that record consists of numerous single penalty violations. With-

out ruling on how MSHA should reconcile the language of § 110(i) of the Mine Act, 30 U.S.C. § 820(i), with its proposed practices for taking account of an operator's history of previous violations, we remand the record in this case to MSHA (1) to resolve the inconsistency between the MSHA regulations as written and MSHA's written and oral representations to the court, so as to ensure that MSHA does take account of past single penalty violations in deciding whether a special assessment is required in a case where the violation itself might qualify for another single penalty; and (2) to amend or establish regulations, as necessary, that clarify how administration of the single penalty standard will take account of the history of violations of mandatory health and safety standards that do and do not pose significant and substantial threats to miners' safety. In the interim, until MSHA formally complies with our remand, we direct MSHA to instruct its field personnel in assessing single penalties to consider an operator's history of non-significant-and-substantial violations, and to consider an operator's history of past single penalty assessments when imposing regular assessments against operators who commit a significant-and-substantial violation after having committed a series of non-significant-and-substantial violations. We will retain jurisdiction in this case until the remand is complete.[18] An order to this effect is attached.

*It is so ordered.*

### ORDER

In accordance with the opinion issued this day in *Coal Employment Project, et al. v. Dole, et al.*, No. 88–1708, it is hereby

ORDERED that the Mine Safety and Health Administration ("MSHA") resolve any inconsistency in its regulations and policy statements so as to ensure that the history of past single penalty assessments is considered in regular and single penalty assessments pursuant to 30 C.F.R. §§ 100.-3, 100.4, and that MSHA amend or estab-

---

**18.** After MSHA files its amendments or clarifications with this court, the clerk will set a schedule for supplementary briefing and the

matter will be returned to this panel for disposition.

lish policies, as necessary, to ensure that all penalties take account of an operator's history of violations of mandatory standards that do and do not pose significant and substantial threats to miners' safety. It is hereby

FURTHER ORDERED that until MSHA complies formally with said remand, MSHA direct its field personnel in assessing single penalties for non-significant-and-substantial violations to take account of the past history on the part of the mine operators of non-significant-and-substantial violations, and to take into account past single penalty assessments in imposing regular assessments against operators who have previously committed a series of non-significant-and-substantial violations.

Consistent with Local Rule 15(c), this court retains jurisdiction over this case until said proceedings are completed. Upon completion of said proceedings, MSHA shall promptly transmit the record in this case back to this court.