**LOCAL UNION 1261, DISTRICT 22, UNITED MINE WORKERS OF AMERICA, Petitioner,**

**v.**

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION, and Consolidation Coal Company, Respondents.**

**No. 89–1637.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1990.

Decided Oct. 26, 1990.

---

Michael Dinnerstein, with whom Robert H. Stropp, Jr., was on the brief, for petitioner.

Robert M. Vukas, with whom Henry Chajet and Thad S. Huffman were on the brief, for respondent, Consol. Coal Co., L. Joseph Ferrara, for respondent, Federal Mine Safety and Health Review Com'n, also entered an appearance.

Before WALD, Chief Judge, RUTH BADER GINSBURG and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

This case concerns the interpretation of two sentences of the Federal Mine Safety and Health Act, 30 U.S.C. §§ 801 *et seq.* (Mine Act), that provide compensation to miners when a mine is closed by a federal withdrawal order. The two prescriptions at issue, contained in section 111 of the Mine Act, 30 U.S.C. § 821, read in key part:

[1] If a ... mine is closed by [a federal safety inspector's order], all miners working during the shift when such [withdrawal] order was issued who are idled by such order shall be entitled ... to full compensation by the operator ... for the period they are idled, but for not more than the balance of such shift. [2] If such [withdrawal] order is not terminated prior to the next working shift, all miners on that shift who are idled by such order shall be entitled to full compensation by the operator ... for the period they are idled, but for not more than four hours of such shift.

(Sentence numbers added.)

Relying on these prescriptions, petitioner Local Union 1261, District 22, United Mine Workers of America (UMW), sought compensation for sixty-two miners from respondent mine operator Consolidation Coal Company (Consol) following Consol's voluntary closure of a mine, for safety reasons, two shifts (just over twelve hours) before the federal inspector's withdrawal order issued. Reversing the administrative law judge's decision, a sharply divided (3–2) Federal Mine Safety and Health Review Commission (Commission or FMSHRC) held that, in the circumstances presented, no compensation was due. *Local Union 1261*, 11 F.M.S.H.R.C. 1609 (1989).

We conclude that the Commission, although incorrect in labeling the statutory text "clear," and less than forthcoming in dealing with FMSHRC precedent, nevertheless construed the statute reasonably. Satisfied that (1) the Commission's construction of the statute is a permissible one, and that (2) FMSHRC adequately stated the practical and policy considerations ultimately motivating its interpretation, we affirm the Commission's decision.

I.

UMW and Consol jointly stipulated to the relevant facts. Consol's Emery Mine (in Price, Utah) operates on a continuous basis with three eight hour shifts each day: the daylight shift (7:00 a.m.–3.00 p.m.); the afternoon shift (3:00 p.m.–11:00 p.m.); and the graveyard shift (11:00 p.m.–7:00 a.m.). On April 16, 1986, midway through the afternoon shift, Consol detected rising levels of explosive gas in the mine. Consol thereupon closed the mine at 7:00 p.m., told the afternoon shift workers that the mine would remain idled until further notice, and sent those miners home with four-and-a-half hours of pay for the time worked. Consol also telephoned the miners scheduled to work on the next two shifts (the April 16–17 graveyard shift and the April 17 daylight shift), and similarly informed them that, because of the gas levels, the mine would be idled until further notice. Immediately after closing the mine, Consol notified UMW and the Mine Safety Health Administration (MSHA) of its action.

On the morning of April 17, MSHA personnel arrived at the mine and investigated the conditions that had prompted Consol, the evening before, immediately to remove the April 16 afternoon shift workers and close the mine. An MSHA inspector, at 7:14 a.m., issued a withdrawal order pursuant to section 103(k) of the Mine Act, 30 U.S.C. § 813(k), officially closing the mine

until MSHA determined that it was safe to reenter.[1] MSHA allowed mining to resume on April 20, 1986.

UMW claimed compensation from Consol for two sets of miners. Relying on the first sentence of section 111 of the Mine Act, 30 U.S.C. § 821,[2] UMW sought eight hours of pay for each of the thirty-six miners scheduled to work the April 17 daylight shift; relying on the second sentence of the same section,[3] the union requested four hours of pay for each of the twenty-six miners scheduled to work the April 17 afternoon shift. UMW made no claim for pay on behalf of the miners most immediately affected by the April 16, 7:00 p.m. mine closure, *i.e.*, the afternoon shift workers sent home on April 16 with only four-and-a-half hours of pay, and the workers scheduled for the April 16–17 graveyard shift. Those workers, UMW apparently concedes, cannot be fitted within the terms of section 111, because the withdrawal order did not issue until after the hours scheduled for their shifts.

The administrative law judge (ALJ) ruled in favor of UMW. The ALJ reasoned that the MSHA order, not the voluntary shutdown, was the closure that counted, so that compensation was due to the two sets of miners identified by UMW. The Commission disagreed. It held that "to be entitled to [Mine Act section 111 first or second sentence] shift compensation, a miner must either be working *during the shift* when the [withdrawal] order was issued and have been idled by the order or, if the order is not terminated prior to the next working shift, must be on the next *working* shift." *Local Union 1261,* 11 F.M.S.H.R.C. at 1613 (emphasis in original). Because neither set of miners identified by UMW fit this description, the Commission ruled in favor of

Consol. Two Commissioners dissented. 11 F.M.S.H.R.C. at 1618. Their reasoning coincided with that of the ALJ, and they pointed to Commission precedent "squarely applicable": *Peabody Coal Co.,* 1 F.M.S.H.R.C. 1785 (1979).

## II.

We review the Commission's interpretations of the Mine Act under the two-step formulation restated in *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, the court, like the Commission, must "try to determine Congressional intent, using 'traditional tools of statutory construction.'" *NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 123, 108 S.Ct. 413, 420–21, 98 L.Ed.2d 429 (1987) (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 1220–21, 94 L.Ed.2d 434 (1987)). If the intent of Congress is indeed clear, the court, as well as the agency, must give effect to that intent. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. Our decisions call this initial inquiry *"Chevron I"* analysis. *See, e.g., Coal Employment Project v. Dole,* 889 F.2d 1127, 1131 (D.C. Cir.1989).

If, however, the Mine Act is "silent or ambiguous with respect to the specific issue," *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781–82, the court "generally need ask only whether the FMSHRC's interpretation is rational and consistent with the statute, according deference to reasonably defensible constructions of the Mine Act by the Commission." *Simpson v. FMSHRC,* 842 F.2d 453, 458 (D.C.Cir.1988) (internal quotations and citations omitted). Circuit precedent labels this *"Chevron II"* analysis.

---

**1.** Section 103(k) provides in part: "In the event of any accident occurring in a coal or other mine, an authorized representative of the Secretary [of Labor], when present, may issue such orders as he deems appropriate to insure the safety of any person in the coal or other mine...."

**2.** The first sentence prescribes compensation for miners "working during the shift when [a withdrawal] order was issued who are idled by such

order ... for the period they are idled, but for not more than the balance of such shift." *See supra* p. 43.

**3.** If the withdrawal order is not terminated "prior to the next working shift," the second sentence prescribes compensation for "all miners on that shift who are idled by [the] order ... for the period they are idled, but for not more than four hours of such shift." *See supra* p. 43.

*See, e.g., Coal Employment Project,* 889 F.2d at 1131.

The Commission commenced its analysis at the proper starting place, *i.e.,* the statutory text. FMSHRC placed particular stress on the words "working during the shift" in the first sentence of section 111,[4] and concluded that, in context, those words mean *actually working* when the withdrawal order issues.[5] No Emery Mine workers fit that bill because the operator had removed the miners, for safety reasons, over twelve hours earlier.[6] It followed, under the Commission's reading, that no miners qualified under the second sentence of section 111; if no miners were actually working when the withdrawal order issued, there could be no "next" shift in line.

We agree with the Commission that the words "working during the shift" call up images of miners laboring at their tasks. We do not think, however, that the words are unambiguous in context. If the first rule of statutory construction is "Read," the second rule is "Read On!" The second sentence of section 111 uses the words "next working shift," and Consol concedes that the intended meaning of those words is next shift *scheduled to work.*[7] If "working" means scheduled to work in the second sentence of section 111, "working" could bear that meaning in the first sentence as well. While we do not agree with UMW that "working" *must* mean "scheduled to work" in both sentences,[8] UMW's reading surely meets the plausibility test. Thus, looking to the statutory text itself, we find neither the meaning proffered by the Commission, nor the one pressed by UMW, "plain."

---

4. For the text of the first and second sentences of section 111, *see supra* p. 43.

5. FMSHRC observed that section 111 sets out a "graduated scheme of increasing compensation commensurate with increasingly serious operator conduct." *Local Union 1261,* 11 F.M.S.H.R.C. at 1613. First and second sentence compensation does not depend upon any showing of culpability on the operator's part. In contrast, the third sentence of section 111 provides up to one week of compensation to miners who are idled because the operator failed to comply with a mandatory safety standard, and the fourth sentence provides double compensation to any miner who performs work in a mine when an MSHA withdrawal order is in effect.

6. The Commission specifically noted, and UMW does not dispute, that "this case does not involve an attempt to avoid section 111 liability by withdrawing miners in anticipation of withdrawal action by MSHA." 11 F.M.S.H.R.C. at 1614 n. 6.

7. UMW reads the Commission's decision as limiting second sentence compensation to miners who are called back before their shift ends and actually perform some work. *See* Brief of Petitioner at 12, 15. We do not so comprehend FMSHRC's decision; nor does Consol read it that way, as counsel for Consol clarified in response to the court's inquiry at oral argument.

> Court: [L]et me give you the case where four hours into the first shift, the withdrawal order issues and it stays in effect for the balance of that shift and for all of the next shift. So people scheduled for the next shift never actually work. What compensation is due under your reading of the statute or the reading you attribute to the Commission?
> Counsel: The next shift was scheduled to work and in fact may very well come out to work. . . .
> . . . .
> Court: [Is it] your interpretation ... that if they show up, even if they never work on that shift because the withdrawal order persists, they will get four hours of pay, although they didn't work at all?
> Counsel: Yes, yes.
> Court: Then you reject the interpretation that [UMW] attributes to the Commission, which is that unless the withdrawal order ends during the next shift, so they actually work one hour, two hours, they don't get any compensation.
> Counsel: No, I reject that.

Were UMW correct concerning the Commission's reading of section 111's second sentence, we would have cause to doubt the reasonableness of FMSHRC's interpretation of the statute.

8. *Cf. Emerald Mines Co. v. FMSHRC,* 863 F.2d 51, 54 n. 2 (D.C.Cir.1988) (word "inspection" does not inevitably have same meaning in all contexts of Mine Act); *Brock v. Peabody Coal Co.,* 822 F.2d 1134, 1151–52 (D.C.Cir.1987) (concurring opinion) (word "miner" need not have same meaning for all purposes in Mine Act); Cook, *"Substance" and "Procedure" in the Conflict of Laws,* 42 YALE L.J. 333, 337 (1933) ("The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against.").

The "traditional tools of statutory construction" include not only the words of the statute, but also its relevant legislative history. We set out below the key passage from the Senate Committee Report:

> [T]he bill provides at Section [111] that miners who are withdrawn from a mine because of the issuance of a withdrawal order shall receive certain compensation during periods of their withdrawal. This provision, drawn from the Coal Act, is not intended to be punitive, but recognizes that miners should not lose pay because of the operator's violations, or because of an imminent danger which was totally outside their control. It is therefore a remedial provision which also provides added incentive for the operator to comply with the law. This provision will also remove any possible inhibition on the inspector in the issuance of closure orders.

S.Rep. No. 95–181, 95th Cong., 1st Sess. 46–47, *reprinted in* 1977 U.S.Code Cong. & Admin.News 3401, 3446. This language does not lead inexorably to the Commission's interpretation.

First, the Report does not focus on the word "working," the term featured by the Commission. Instead, the Report speaks of the miner "withdrawn from a mine because of the issuance of a withdrawal order." [9] Second, the Commission deemed it inconsistent with "the clear intent and purpose of the Mine Act," 11 F.M.S.H.R.C. at 1614, to exact section 111 payments from a mine operator like Consol who had conscientiously obeyed the "safety first" edict. [10] The Senate Report, however, indicates that Congress intended to provide section 111 compensation, not only when the operator is culpable, but also when the mine has become dangerous without operator fault.

Third, while the Commission's reading does offer an incentive to operators to close the mine promptly for safety's sake, without awaiting the inspector's arrival, the ALJ and dissenting Commissioners' position is also compatible with the Senate Report's stress on promoting compliance with the law. For example, if an operator, who has voluntarily closed an unsafe mine, is required to pay up to one and one-half shifts of compensation when an MSHA withdrawal order is issued, the operator will have an enhanced incentive to make the mine safe before the end of those shifts and thus minimize payments to miners who are not producing.

Finally, in concluding that the Commission's position is not dictated by the statute's text or legislative history, we observe that it would be unusual for a statute free from ambiguity to be subject to different interpretations by the Commission over time, or, more immediately, by a closely divided panel in the decision under review. In this regard, we agree with the dissenting Commissioners that the Commission majority did not convincingly distinguish *Peabody Coal Co.*, 1 F.M.S.H.R.C. 1785 (1979).

In *Peabody Coal*, miners were initially withdrawn by an order that fell outside the sphere of section 111 compensation. Six days later, while the miners were still out, an "imminent danger" withdrawal order issued. The Commission directed the operator to compensate the miners who would have been at work but for the initial, noncompensable withdrawal order. In so ruling, the Commission expressly rejected the operator's argument that the statute provides first sentence compensation only for miners actually at work when a withdrawal order issues. The Commission said: "The miners *normally scheduled to work* the . . . shift were idled within the meaning of section [111] . . . by the . . . withdrawal

---

**9.** It would appear that the Senate Committee envisioned among the "withdrawn," not only the miners ordered out of the mine by a withdrawal order, but also those entitled to second or third sentence compensation, although not in the mine at the time the withdrawal order issues. *See supra* notes 5 and 7.

**10.** Congress declared in section 2 of the Mine Act, 30 U.S.C. § 801, that "the first priority . . . of all in the coal . . . industry must be the health and safety of its most precious resource—the miner." The section furthermore states that mine operators, with the assistance of the miners, "have the primary responsibility to prevent the existence of [unsafe and unhealthful] conditions and practices" in the mines.

order. Therefore, [they] are entitled to compensation." 1 F.M.S.H.R.C. at 1790 (emphasis added).

Either the Commission missed the "plain meaning" of the statute in *Peabody Coal*, or the meaning is not so plain, and the section 111 first and second prescriptions are subject to more than one plausible interpretation. We think the latter explanation is correct. While the Commission departed from *Peabody Coal*, both in reasoning and result, and so effectively overruled that decision, FMSHRC ultimately and satisfactorily accounted for its volte-face.

■ Before stating why we are persuaded that the Commission's decision passes muster under *Chevron II* review, we note that FMSHRC's opinion was less than lucidly arranged, and therefore gave us pause. Portions of the opinion convey the impression that the majority was proceeding along a *Chevron I* track, and so regarded UMW's compensation request as beyond FMSHRC's authority to entertain. We recognize that "when an agency's decision rests on a supposed mandate by Congress and the agency is later determined to be wrong as to the mandate, a remand may be required for it to exercise its discretion on the issue." *General Motors Corp. v. NHTSA*, 898 F.2d 165, 171 (D.C.Cir.1990). In this case, however, we discern that the Commission was mindful of "policy and administrative concerns," *id.* at 172, and wove them into the calculus throughout its opinion. *See* 11 F.M.S.H.R.C. at 1614 (observing that "[a]part from the plain wording of the statute, there are also practical considerations" justifying the Commission's decision). We therefore conclude that no remand is necessary because FMSHRC "did exercise its discretion in interpreting the statutory scheme in light of its policy judgment and expertise." *General Motors Corp.*, 898 F.2d at 171.

■ Turning to our *Chevron II* grounds for upholding the Commission's interpretation, we note first that the word "working" indeed can mean "on-the-job in the mine." By attributing that meaning to section 111's first prescription, the Commission reasonably maintains that it is advancing the overriding mine safety aim of Congress. We cannot gainsay the Commission's judgment that its current decision fosters prompt evacuations and discourages operator hesitation pending the arrival of inspectors.

Furthermore, as the Senate Committee Report stated, *see supra* p. 46, Congress provided for compensation, in the event that a withdrawal order terminates work by miners, in part to insulate the mine inspector from miner animus. As the Commission commented:

> Here, however, the operator unilaterally and voluntarily withdrew its own miners and notified all shifts that the mine would be closed until further notice. Obviously, under such circumstances, no inhibitions would have attached to the inspector's enforcement actions taken twelve hours later when the mine was empty. The need to insulate the inspector from any purported miner animus had by then evaporated.

*Local Union 1261*, 11 F.M.S.H.R.C. at 1615. In addition, the Commission observed that its decision

> eliminates the roulette wheel effect that results from basing [first sentence] shift compensation solely upon idlement, wherein shift compensation is awarded to those not actually working and is based on the chance timing of the inspection and the order's issuance rather than upon the claimants' actual deprivation of work.

*Id.* at 1616; *see supra* p. 44.

### CONCLUSION

In sum, "[a]lthough we disagree with [the Commission's] position that the [Mine Act] unambiguously supports only one permissible interpretation, we do agree, more modestly, that [the Commission's] interpretation is reasonable under controlling principles of statutory interpretation." *See New York State Dep't of Social Services v. Bowen*, 835 F.2d 360, 361 (D.C.Cir.1987), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2820, 100 L.Ed.2d 922 (1988). The Commission, it is true, has departed from its 1979 *Peabody Coal* precedent, but we are mindful

48

that *"Chevron* itself involved an agency about-face on a significant question of statutory construction." *See General Am. Transp. Corp. v. ICC,* 872 F.2d 1048, 1054 (D.C.Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990) (accepting ICC's reversal of a forty-year-old position). The Commission has satisfactorily justified its position in relation to miner safety, the concern of prime importance to Congress.[11] We therefore affirm the Commission's decision and deny the petition for review.[12]

*It is so ordered.*

---

11. *Compare King Broadcasting Co. v. FCC,* 860 F.2d 465, 469–70 (D.C.Cir.1988), where the FCC denied an exemption petition after finding congressional intent clear under *Chevron I.* The FCC's decision had departed from the Commission's own precedent without providing a reasonable explanation for the change. The court concluded that the statute was ambiguous, and remanded the matter to the FCC for further consideration. *Accord American Petroleum Inst. v. EPA,* 906 F.2d 729, 740 (D.C.Cir.1990).

In the case before us, in contrast, the Commission did supply the essential accounting, and FMSHRC's policy-based explanation stands apart from its "plain meaning" false start.

12. In view of our disposition, we do not reach UMW's objection to the ALJ's failure to assess prejudgment interest on the compensation he awarded.