**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Manuel CONTRERAS, Defendant–Appellant.**

**No. 94–30306.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 11, 1995.

Decided Aug. 17, 1995.

Linda Friedman Ramirez (argued), Leslie Kay (briefed), Portland, OR, for defendant-appellant.

John C. Laing, Sp. Asst. U.S. Atty., Portland, OR, for plaintiff-appellee.

Before: GOODWIN and HUG, Circuit Judges, and SCHWARZER,* District Judge.

GOODWIN, Circuit Judge:

Manuel Contreras, a citizen of Mexico, appeals his conviction for Aggravated Illegal Reentry into the United States, 8 U.S.C. § 1326(a) and (b)(2). The conviction is affirmed.

### Background

On July 29, 1988, Contreras was arrested on a charge of possession with intent to distribute cocaine. On August 9, 1988, while in custody on this charge, Contreras was served with an Order to Show Cause why he should not be deported. Contreras requested a prompt hearing.

A telephonic deportation hearing was held August 12, 1988. Speaking through a Spanish interpreter, Contreras admitted the facts recited in the show-cause order. The Immigration Judge ordered deportation and advised Contreras of his right to seek judicial review of the order of deportation.

Contreras was not deported immediately following the August 12, 1988 hearing, however, because he still had to face the cocaine charge. On that charge he was convicted and, on May 1, 1989, sentenced to 47 months imprisonment and three years of supervised release. For purposes of this appeal, the terms of his supervised release are significant. They were that Contreras was prohibited from returning to the United States without first obtaining written permission from the U.S. Attorney for the District of Oregon and I.N.S. Officials.

Contreras served his prison term and, on December 30, 1991, was deported to Mexico. His three-year period of supervised release then began to run. In light of his physical expulsion from the United States, "super-

vised release" is not a very accurate description of his status. However, nomenclature is not important. What is important is that Contreras, without authorization and before the three-year period expired, returned to Oregon. On January 29, 1993, he was arrested on a second drug charge, and a federal indictment followed on February 17, 1993. On April 8, 1993, while in custody for this drug charge, Contreras was arraigned on an additional charge, namely that his unscheduled reappearance in the Pacific Northwest constituted a violation of the conditions of his supervised release.

On November 18, 1993, the United States dismissed the drug charge. Contreras admitted violating the terms of his supervised release and was sentenced to time served. Then came the indictment that eventually led to this appeal. On the same day that the government dismissed the drug charge, the grand jury indicted Contreras for Aggravated Illegal Reentry into the United States, a violation of 8 U.S.C. § 1326(a) and (b)(2). He was convicted, and now appeals. We have jurisdiction. 28 U.S.C. § 1291.

### Discussion

1. Contreras argues that he was deprived of the right to a speedy trial. Although a speedy trial is guaranteed the accused by the Sixth Amendment to the Constitution, *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), Contreras premises his argument not on the Sixth Amendment but on the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*

The Speedy Trial Act requires, *inter alia,* that

[a]ny ... indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested ... in connection with such charges.

18 U.S.C. § 3161(b). Failure to comply with Section 3161 requires dismissal of the indictment. 18 U.S.C. § 3162(a)(1). "We review legal questions regarding application of the

---

* Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

Speedy Trial Act *de novo*, but factual findings are reviewed for clear error." *United States v. Hoslett*, 998 F.2d 648, 652 (9th Cir.1993).

Contreras was arrested for the supervised release violation on April 8, 1993. The indictment on the illegal reentry charge was not returned until November 18, 1993, seven months later. Although the arrest and subsequent indictment were for different charges, Contreras argues that the arrest for the supervised release violation was "in connection with" the illegal reentry indictment because he was arrested and indicted for the same underlying conduct, *i.e.*, reentering the United States without permission.

This is an inert argument because we do not use a "same conduct" standard for purposes of applying the Speedy Trial Act. We have held that "18 U.S.C. section 3161(b) requires something more than that the acts leading to the detention be the same as those underlying the eventual criminal charge." *Hoslett*, 998 F.2d at 653. In *Hoslett* we intimated that "something more" might mean using an earlier charge as "a ruse for delay in obtaining an indictment." *Id.*

Here we do not see "something more." We see, rather, that Contreras was held in custody on both the drug charge and the supervised release violation until November 18, the date on which he was indicted on the illegal reentry. The district court found that Contreras' detention from April to November was not on account of a government effort to gather evidence to obtain an indictment. The finding is not clearly erroneous.

■ It was, therefore, only upon Contreras' November 18, 1993 arrest and indictment for illegal reentry that the time periods of the Speedy Trial Act were triggered. We affirm the determination of the district court that, on this record, no violation of the Act has been made out.

■ 2. Contreras next argues that the delay between his January 29, 1993 arrest on federal drug charges and the November 18, 1993 indictment on the illegal reentry charge was so excessive that it constitutes a violation of his due process rights under the Fifth Amendment.

We review claims of due process violations caused by pre-indictment delay under the abuse-of-discretion standard. *United States v. Sherlock*, 865 F.2d 1069, 1073 (9th Cir.1989). Pursuant to the Supreme Court decision in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), this court utilizes a two-pronged test to determine whether a pre-indictment delay has risen to the level of a denial of due process. *United States v. Moran*, 759 F.2d 777, 780 (9th Cir.1985), *cert. denied*, 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986). Under the first prong, the defendant has the burden of proving that "actual prejudice" occurred from the delay. *Id.* If "actual prejudice" is established, the court then weighs the length of the pre-indictment delay against the reason for the delay. *Id.* The defendant's burden is a heavy one: "the proof must be definite and not speculative...."

*United States v. Gonzalez–Sandoval*, 894 F.2d 1043, 1050 (9th Cir.1990).

Contreras asserts that his prejudice results from not being able to seek consolidation of the sentencing for the supervised release violation with the illegal reentry charge. In *Gonzalez–Sandoval*, the appellant made a similar argument: had he been indicted, tried, and convicted earlier, he would have sought to receive sentencing concurrent with another sentence. *Id.* at 1051. We noted that "[p]revious decisions by this court have applied the actual prejudice test stringently," and held that "[t]his claim ... is entirely speculative." *Id.*

Contreras' argument is hardly less speculative than Gonzalez–Sandoval's. The Guidelines provide that "[i]t is the policy of the [United States Sentencing] Commission that the sanction imposed upon revocation [of supervised release] is to be served consecutively to any other term of imprisonment imposed for any criminal conduct that is the basis of the revocation." U.S.S.G. Ch. 7, Pt. B, Introductory Commentary. Chapter 7 policy statements are not binding on the district court, *United States v. Forrester*, 19 F.3d 482 (9th Cir.1994), as Contreras notes, but they are an element in the exercise of discretion and it would be an abuse of discre-

tion for the district court to ignore them. *Id.* at 484. The district court did not abuse its discretion in finding that Contreras failed to show actual prejudice.

■ 3. Contreras next attacks his 1991 deportation order, on three grounds: (1) that he was not advised properly of eligibility for relief from deportation; (2) that key portions of the hearing were not translated into Spanish; and (3) that the hearing was conducted by telephone. Whether the defects in an underlying deportation invalidated the proceeding and order for use in a later criminal proceeding is a mixed question of law and fact which we review *de novo*. *United States v. Proa–Tovar*, 975 F.2d 592, 594 (9th Cir. 1992) (en banc).

■ In *United States v. Mendoza–Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), the Supreme Court held that an alien must be permitted to collaterally attack a deportation order where the deportation proceeding upon which it was based was so fundamentally flawed as to effectively foreclose judicial review. 481 U.S. at 839–40, 107 S.Ct. at 2155–56. In *Mendoza–Lopez*, the Court found that the respondents were effectively deprived of their right to judicial review where the IJ failed to inform them of their eligibility for suspension of the deportation and permitted waivers of the right to appeal that were not considered or intelligent. *Id.* at 840, 107 S.Ct. at 2155. Here Contreras does not allege that the IJ failed to inform him of his right to appeal. Therefore, we examine each of Contreras' three allegations to determine whether they, individually or in sum, constitute due process violations capable of sustaining a collateral attack on the deportation order.

a. *Notice of eligibility for relief from deportation.* Although we do not hold that an explanation of eligibility for relief from deportation given to one of a group of detainees (other than the defendant) will always suffice to satisfy due process in mass hearings, we are satisfied that, under the particular circumstances at issue here, Contreras received adequate notification of his eligibility to apply for relief. Only three other detainees participated in Contreras' deportation hearing. From the outset, the IJ questioned the four

detainees interchangeably as a group and individually, thus putting them on notice that the rights of each of them were being addressed and considered in a joint hearing. During the hearing, the IJ gave an explanation of the eligibility requirements for relief from deportation and of the right of a detainee meeting those requirements to apply for such relief; this explanation was delivered both in English and in Spanish. When the IJ later questioned Contreras directly on the issue, the IJ referenced his earlier explanation of the eligibility requirements by pointing out to Contreras that he had been here in the United States longer than seven years and was married to a United States citizen. Contreras nonetheless requested deportation. Given these particular circumstances, Contreras was adequately informed of his eligibility for relief.

b. *Failure to translate portions of the hearing into Spanish.* With respect to the failure to translate certain off-the-record discussions between the IJ and INS hearing counsel, we note that Contreras responded affirmatively when asked if he spoke English, and an affidavit in the record by a state police detective stated that Contreras spoke English very well. Moreover, the entire colloquy with Contreras himself was translated by the interpreter. The only untranslated discussion with the INS hearing counsel concerned the existence of evidence precluding a finding of good moral character. Although that discussion was not irrelevant to Contreras' rights, the failure to translate it did not foreclose judicial review of the deportation proceeding. *Id.* at 838, 107 S.Ct. at 2155.

c. *The telephonic hearing.* A detainee is entitled to an in-person deportation hearing. *Purba v. I.N.S.*, 884 F.2d 516, 517 (9th Cir. 1989). Contreras was clearly deprived of this right. Because Contreras was not represented by counsel and there is no evidence to indicate that he was otherwise informed of this right, he cannot be deemed to have waived it simply because he did not affirmatively request an in-person hearing. Nevertheless, this due process violation is of no consequence here, because under these circumstances it did not effectively deprive Contreras of his right to judicial review. *Id.*

Contreras would have to show that he was prejudiced as a result of the violation, *United States v. Leon–Leon,* 35 F.3d 1428, 1431 (9th Cir.1994) (citing *Proa–Tovar,* 975 F.2d at 595), and inasmuch as he has failed to do so, this violation cannot, in and of itself, support Contreras' collateral attack.

The procedure at the deportation hearing was far from exemplary. Nevertheless, we cannot say that the procedural deficiencies, separately or in sum, can sustain this collateral attack of the deportation order.

■ 4. Contreras next argues that the district court erred in admitting in evidence Contreras' warrant of deportation (I–205 form) under the public records exception to the hearsay rule. Fed.R.Evid. 803(8)(B). We review a decision to admit evidence under exceptions to the hearsay rule for abuse of discretion. *United States v. Bland,* 961 F.2d 123, 126 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 170, 121 L.Ed.2d 117 (1992). Whether the admission of evidence violated the Sixth Amendment's Confrontation Clause is a question we review *de novo. United States v. Garcia,* 16 F.3d 341, 342 (9th Cir.1994).

The I–205 form is hearsay, but is admissible under the public records exception to the hearsay rule. *United States v. Hernandez–Rojas,* 617 F.2d 533 (9th Cir.1980) (warrant of deportation properly admitted to prove a material element of a Section 1326 violation). Contreras argues that this court should "revisit" *Hernandez–Rojas* because penalties for Section 1326 violations have been increased since 1980, when *Hernandez–Rojas* was decided. That argument is a textbook example of a *non sequitur.* We ruled as we did in *Hernandez–Rojas* because the notation on an I–205 form indicating that an alien has left the country is a routine, objective, indeed mechanical recording of an unambiguous factual matter. *That* is why the I–205 form constitutes a "public record" for purposes of the hearsay exception. Contreras does not argue that I–205 forms are prepared any differently today than they were in 1980.

Nor did the admission of the I–205 form violate the Confrontation Clause. The admission of evidence under a firmly rooted exception to the hearsay rule does not violate the Confrontation Clause, *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), and the public records exception to the hearsay rule is firmly rooted. *United States v. DeWater,* 846 F.2d 528, 530 (9th Cir.1988); *see United States v. Ray,* 920 F.2d 562, 566 (9th Cir.1990), quoting *Roberts,* 448 U.S. at 66 n. 8, 100 S.Ct. at 2539 n. 8 ("Properly administered, the business and public records exceptions would seem to be among the safest of the hearsay exceptions.").

■ 5. Contreras argues that there was insufficient evidence to support the court's finding that he had been previously deported. Evidence is sufficient to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ The Warrant of Deportation indicates that Contreras was deported at the El Paso, Texas, Bridge of the Americas Port of Entry on December 30, 1991. The departure was witnessed by INS personnel, and included in this record is a verified departure form bearing Contreras' signature and thumbprint. Contreras concedes that the evidence indicates that he was last seen on the Bridge of the Americas, heading by foot away from the United States toward Mexico, but he argues that this evidence is insufficient "as a matter of law" to establish the element of deportation because it does not establish that he "actually reached Mexican soil"—that is, he could have hoodwinked his INS escorts. He bases this argument on *Yonejiro Nakasuji v. Seager et al.,* 73 F.2d 37 (9th Cir.1934), a case that has not been cited by any court in more than sixty years.

In *Yonejiro,* a vessel arrived at San Pedro with five aliens aboard. An immigration officer ordered the vessel's master to deport the aliens from the United States. The master took the aliens out to international waters, then wheeled around and returned to San Pedro. His ruse did not go undetected, and the master was fined for violating the order

to deport. We affirmed the fine, holding that "[a]ppellant did not comply with the order to deport by simply taking the aliens to foreign waters, keeping them aboard his vessel, and returning here. There was no removal of the alien 'to the country from which he came,' or to any other foreign place." *Id.* at 39.

*Yonejiro* was a case about a sham deportation. The master was not ordered to take the aliens on a round-trip cruise but to send them away. The master brought them back, and we upheld the penalty. Suggesting the possibility that his was also a sham deportation—that he may have frustrated the deportation order by scrambling back to the United States without ever actually reaching Mexican soil—Contreras argues that *Yonejiro* bars his punishment for violating Section 1326. If accepted, that suggestion would turn *Yonejiro* on its head and reward the very sort of artifice that *Yonejiro* condemned. Contreras would treat the "run of the mill" Section 1326 defendant who (at least initially) obeyed the order of deportation before reinsinuating himself into the United States more harshly than the guileful Section 1326 defendant who flouted the order of deportation from the outset. *Yonejiro* does not support this perverse line of argument.

Nor does *Yonejiro* lend comfort to Contreras' obtuse position regarding *sufficiency* of the evidence in Section 1326 prosecutions. The master of the vessel in that case conceded that he had never taken the aliens to a foreign place, so *Yonejiro* does not speak to the question of what constitutes sufficient evidence that an alien had arrived on foreign soil. Here the evidence was that Contreras was last seen heading on foot across the Bridge of the Americas, toward Mexico. Unless we wish to entertain bizarre suggestions—perhaps that he vaulted over the bridge's railing and headed north before reaching the other side, or perhaps that he was whisked up into the skies by a lighter-than-air vessel—the inference is overwhelming that Contreras followed the bridge to where it led. The evidence was sufficient to support the conviction.

6. Contreras argues that the district court erred in admitting the testimony of I.N.S. Special Agent Ruben Vela, who testified as to how the I.N.S. carries out deportations, observes alien departures, and completes I–205 forms. Agent Vela had observed deportations in Nogales, Arizona, and Mesa, California, but never at El Paso, Texas. Because Contreras' deportation took place at El Paso, Texas, Contreras argues that Agent Vela's testimony violated the requirement that a witness testify only as to matters of which he has personal knowledge, Fed.R.Evid. 602.

Because Contreras failed to object to this testimony, we review for plain error. *United States v. Dischner,* 974 F.2d 1502, 1514 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993). There was none.

7. Contreras' final argument is that the government presented insufficient evidence to establish his alienage. To establish alienage, the government presented (1) the deportation order; (2) the deportation hearing transcript, which indicates that Contreras, under oath, admitted his alienage and Mexican citizenship;[1] and (3) the testimony of Agent Vela that Contreras was a citizen of Mexico.

In *United States v. Ortiz–Lopez,* 24 F.3d 53 (9th Cir.1994), this court held that a deportation order, without more, is insufficient to establish alienage. *Id.* at 56. Here there was more. The evidence was sufficient to establish alienage.

AFFIRMED.

---

1. Contreras did not object to the admission of the    transcript of his deportation hearing.