**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Manuel ROMO–ROMO, Defendant–
Appellant.**

No. 00–10011.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 12, 2001

Filed April 24, 2001

H. David Grunbaum, Assistant Federal Public Defender, San Jose, California, for defendant-appellant.

J. Douglas Wilson, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.

Before: FERNANDEZ, and KLEINFELD, Circuit Judges, and MOSKOWITZ,* District Judge.

FERNANDEZ, Circuit Judge:

Manuel Romo–Romo appeals his conviction and sentence for being found in the United States after he was deported therefrom. *See* 8 U.S.C. § 1326. He asserts that the district court erroneously instructed the jury that he did not actually have to leave United States soil in order to be deported. We agree and reverse.

## BACKGROUND

In 1995, a warrant of deportation was issued for Romo, who had been convicted and sentenced for commission of an aggravated felony. An Immigration and Naturalization Service Detention Enforcement Officer, Gerald N. Sullivan, executed the warrant of deportation, and fingerprinted Romo to assure that the right person was being deported. A few years later, Romo was found in the United States again and was prosecuted. *See id.*

At trial, Sullivan explained the careful procedures that are used to effect a deportation of a person like Romo. A group of aliens is loaded onto an INS bus and driven to the port of entry at Nogales, Arizona. The bus stops at a place about a foot to a foot and a half from the border, where there is a fence on one side of the bus, a wall on the other, but no barrier in back of it. The aliens are then removed from the bus in groups of five, given their belongings and watched as they walk across the border. The INS officers wait for awhile in order to make sure that everyone has crossed the border, and then they make out the paperwork which memorializes that fact. While Sullivan did not specifically remember Romo himself, he was confident that the trip took place in daylight and that he would not have signed the paperwork if he had not seen Romo leave this country.

Romo did not dispute that Sullivan had described the usual procedure, but he claimed that the process had gone awry. He testified that he was, indeed, taken to the border and that he did get off the bus. But, he said, some confusion ensued because certain of his papers were lost, and the two officers were also busy talking between themselves and to other aliens. As Romo explained it, he became upset that his papers were missing and, while

* The Honorable Barry T. Moskowitz, District Judge for the Southern District of California, sitting by designation.

the officers were distracted, he "went around ... to the side of the bus, hid around the side of the bus and [he] kept walking until [he] got to the street." Thus, although he was later found in the United States, he claims that he never left it in the first place.

Not content with its evidence, which showed it was unlikely that Romo could really have managed to avoid leaving the United States, the government sought an instruction that he did not have to do so. The district court agreed and told the jury that:

> An alien who is subject to a lawful deportation order, who is brought to the American side of the Mexico–United States border by immigration authorities in order to be deported and who was last seen by those authorities headed toward Mexico, but who never actually enters Mexico because of his own guile or deceit, may be considered to have been deported.

During deliberations, the jury sent a note in which it expressed some concern about whether Romo had actually been seen crossing the border, and the court, essentially, said that he did not actually have to cross the border, as long as the border officers reasonably carried out their duties.

The jury returned a guilty verdict and this appeal ensued.

## STANDARD OF REVIEW

"Whether a jury instruction misstates elements of a statutory crime is a question of law reviewed de novo." *United States v. Johnson*, 956 F.2d 197, 199 (9th Cir.1992). We also review de novo whether the district court erred in "answering the jury's questions regarding instructions." *United States v. Warren*, 984 F.2d 325, 331 (9th Cir.1993).

When we determine that there is an instructional error, that "requires reversal unless there is no reasonable possibility that the error materially affected the verdict or, in other words, that the error was harmless beyond a reasonable doubt." *United States v. Rubio–Villareal*, 967 F.2d 294, 297 n. 3 (9th Cir.1992) (en banc); *see also Neder v. United States*, 527 U.S. 1, 15, 119 S.Ct. 1827, 1837, 144 L.Ed.2d 35 (1999); *Warren*, 984 F.2d at 331.

## DISCUSSION

This appeal raises a single question of statutory construction: Can an alien be said to have been deported and to have reentered when he never left the country at all?[1] The answer to that question is no, as we will now more fully explain.

We start, as we must, with the statute itself which provides, in pertinent part, that "any alien who—has been ... deported, ... and thereafter ... enters, attempts to enter, or is at any time found in, the United States ... shall be fined under Title 18, or imprisoned ... or both." 8 U.S.C. § 1326(a). At first blush, it certainly appears that an alien cannot have committed that crime unless he has at least set foot outside of this country. Nothing in the statute suggests that a valiant, but failed, attempt to remove the alien from this country amounts to deportation. And, one might ask, how can a person have been deported if he has never been removed from our soil, as the law directs? *See* 8 U.S.C. § 1231(b). However, we will give some further attention to the precise words of the statute.

In so doing, we adhere to the usual axiom that Congress " 'says in a

---

1. Romo does raise some sentencing issues also, but because we reverse his conviction we need not consider those.

statute what it means and means in a statute what it says there.'" *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 5, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000) (citation omitted). And in going about that, we should usually give words their plain, natural, ordinary and commonly understood meanings. *See id.* at 5–7, 120 S.Ct. at 1947–48; *United States v. Sun–Diamond Growers,* 526 U.S. 398, 407, 119 S.Ct. 1402, 1407, 143 L.Ed.2d 576 (1999); *Pena–Cabanillas v. United States,* 394 F.2d 785, 789 (9th Cir. 1968). We must then apply the further principle that " 'if the language of a statute is clear, we look no further than that language in determining the statute's meaning.'" *Oregon Natural Res. Council, Inc. v. Kantor,* 99 F.3d 334, 339 (9th Cir.1996) (citations omitted). At least, we do so unless "the apparent plain meaning of a statute ... leads to 'absurd or impracticable consequences.'" *Id.* (citations omitted); *see also Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 253, 120 S.Ct. 2180, 2191, 147 L.Ed.2d 187 (2000); *Hartford Underwriters,* 530 U.S. at 5, 120 S.Ct. at 1947.

When these principles are applied, it seems even more apparent that an alien must actually leave the country before he can be convicted under § 1326. Over 100 years ago, the Supreme Court declared that " '[d]eportation' is the removal of an alien out of the country, simply because his presence is deemed inconsistent with the public welfare." *Fong Yue Ting v. United States,* 149 U.S. 698, 709, 13 S.Ct. 1016, 1020, 37 L.Ed. 905 (1893) *overruled in part on other grounds by Yamataya v. Fisher,* 189 U.S. 86, 101, 23 S.Ct. 611, 614–15, 47 L.Ed. 721 (1903). That, the Court said, is not a form of punishment "either under the laws of the country out of which he is sent or under those of the country to which he is taken." *Id.* The court reiterated that concept somewhat more recently when it set forth the following definition:

" '[d]eportation' means the moving of someone away from the United States, after his exclusion or expulsion." *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596 n. 4, 73 S.Ct. 472, 477 n. 4, 97 L.Ed. 576 (1953). That would seem to be enough for our purposes, but it is worth noting that it also accords with common dictionary definitions. Black's Law Dictionary 450 (7th ed.1999), defines deportation as the "act or an instance of removing a person to another country; esp., the expulsion or transfer of an alien from a country." The definition of deportation in Webster's Third New International Dictionary 605 (1986), is comparable: "the removal from a country of an alien whose presence in the country is unlawful or is held to be prejudicial to the public welfare." "Deport" is defined as "to send out of the country." *Id.* Virtually all of our authority points in the same direction.

Not surprisingly, we have said that " '[d]eportation' refers to the removal from the country of aliens who are physically present in the United States." *Alvarez–Mendez v. Stock,* 941 F.2d 956, 961 n. 4 (9th Cir.1991). We had expressed the same view decades earlier when we opined that " '[d]eportation' is 'the removal or sending back of an alien to the country from which he came.'" *Nakasuji v. Seager,* 73 F.2d 37, 39 (9th Cir.1934) (citation omitted).

Only one case beclouds this analysis, and the brume that it generated is no more than an evanescent dictum. In that case, an alien claimed that the evidence did not support his conviction because a rational trier of fact could not determine that he had been deported. *United States v. Contreras,* 63 F.3d 852, 857 (9th Cir.1995). He did not actually testify that he had evaded deportation, and the evidence showed that he had been fingerprinted, signed a departure form, and was last seen trudging across the Bridge of the Amer-

icas toward Mexico at the El Paso, Texas port of entry. *Id.* But, he argued, "he could have hoodwinked his INS escorts" and never "'actually reached Mexican soil.'" *Id.* We denigrated his bizarre suggestion that he might somehow have "vaulted over the bridge's railing" or even have been "whisked up into the skies." *Id.* at 858. Because we were not afflicted by barminess, we declared that "the inference is overwhelming that Contreras followed the bridge to where it led." *Id.* In other words, the evidence was sufficient. *Id.* There is nothing particularly amazing about that conclusion, but along the way to a decision we also said that it was perverse to suggest that a defendant who obeyed the order of deportation before coming back to this country should be treated more harshly than an alien who used guile and "flouted the order of deportation from the outset." *Id.* Well, that simply goes to show why a dictum must be treated with great wariness; our offhand ruminations are simply no substitute for focused attention on the ramifications of an actual decision. Simply put, perverse or not, a criminal statute that proscribes coming back is not the same as one that proscribes staying here, and § 1326 looks like the former. But that does lead to a further exploration of § 1326 itself.

█ It is difficult to imagine what Congress could have intended when it used the language enter, attempts to enter, and found in, if it did not contemplate a return to this country after having first left it. As of now, entry is not defined in the Immigration and Nationality Act,[2] but that is of no real significance because "[t]he definition of 'entry' as applied for various purposes in our immigration laws was evolved judicially." *Rosenberg v. Fleuti,* 374 U.S. 449, 453, 83 S.Ct. 1804, 1807, 10 L.Ed.2d 1000 (1963). Entry, plainly enough, "'includes any coming of an alien from a foreign country into the United States.'" *Id.* (citation omitted). As we have said, the plain meaning of § 1326 is that a deported alien is prohibited from reentering. *United States v. Ayala,* 35 F.3d 423, 425 (9th Cir.1994).

And, although the charge here was that Romo was found in the United States, "the courts have not been so benighted as to think that a person could be found in the United States if he had never entered at all." *United States v. Pacheco–Medina,* 212 F.3d 1162, 1165 (9th Cir.2000). On the contrary, "[w]e have said that a 'found in' conviction 'necessarily requires that a defendant commit an act: he must re-enter the United States without permission ... after being deported.'" *Id.* at 1166 (citations omitted); *see also Ayala,* 35 F.3d at 426. To put it still another way, "the government should be required to prove that the defendant had been outside the United States" before prosecuting him for being found here. *United States v. Meza–Villarello,* 602 F.2d 209, 211 (9th Cir.1979).

When the plain words of § 1326 are read naturally and in context, they show that a person who never set foot outside of this country was never deported and never reentered. There is nothing absurd about that. In fact, a contrary reading approaches the absurd, for if the government is correct that it did deport Romo because it tried very hard to do so, it still cannot show that he reentered the place he never left.[3]

There can be no doubt that the instruction was incorrect. Moreover, we cannot

---

**2.** It used to state that an entry was "any coming of an alien into the United States." 8 U.S.C. § 1101(a)(13) (1994).

**3.** Similarly, the statute has an exception which applies to an alien who, "prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory," has obtained express consent to reenter from the Attorney General. 8 U.S.C. § 1326(a)(2). That surely

say that the error was harmless beyond a reasonable doubt. Had the jury believed Romo's story, it would have acquitted him, if properly instructed. And while by no means a necessary predicate to our conclusion, it is significant that the jury itself was concerned about the meaning of the instruction, and was, thereupon, even further misled by a further instruction.

## CONCLUSION

Perhaps a jury would believe Romo's story that he escaped from the clutches of the INS at the very last moment. Perhaps it would agree with the government that the quotidian deportation processes of the INS worked in the usual way to eject him from this country. If it believed him, § 1326 was not violated; if it believed the government, it was. Romo has the right to have a properly instructed jury decide that question.

REVERSED and REMANDED

contemplates that the alien in question has

been outside of this country.