Opinion by Judge McKEOWN; Dissent by Judge N.R. SMITH.
OPINION
McKEOWN, Circuit Judge:
This case illustrates the nuances of our federalist system of government, pitting Indian tribe against Indian tribe, and State and local governments against the federal government and an Indian tribe. The City of Glendale and various other parties (“Glendale”) seek to set aside the Department of the Interior’s decision to accept in trust, for the benefit of the Tohono O’Odham Nation (“the Nation”), a 54-acre parcel of land known as Parcel 2. The Nation hopes to build a destination resort and casino on Parcel 2, which is unincorporated county land, entirely surrounded by the City of Glendale. To say this plan has been controversial is an understatement. But the strong feelings and emotional drama of the casino fight do not dictate the outcome here. This appeal relates only to the status of the land as trust land and does not involve the particulars of Indian gaming, which are the subject of separate proceedings and pending legislation. The district court granted summary judgment for the government after concluding that the Secretary of the Interior reasonably applied the Gila Bend Indian Reservation Lands Replacement Act (“Gila Bend Act”), and that the Act did not violate the Indian Commerce Clause or the Tenth Amendment. We affirm.
Background
I. The Gila Bend Act
The Nation, earlier known as the Papa-go Tribe of Arizona, is a federally recognized Indian Tribe with over 28,000 members. The Gila Bend Reservation was established as early as 1882. Today, the reservation includes non-contiguous land located near Tucson, Phoenix, and the town of Gila Bend, as well as points in between. In 1960, the federal government completed construction of the Painted Rock Dam ten miles downstream from the Gila Bend Reservation. During the *890 late 1970s and early 1980s, the reservation was plagued by flooding from the dam, which eventually destroyed a large farm developed by the Nation, leaving the land unsuitable for economic use.
Congress responded to the flooding and the Nation’s petition for a new reservation with the Gila Bend Act. The purpose of the Act was to “facilitate replacement of reservation lands with lands suitable for sustained economic use which is not principally farming ... and promote the economic self-sufficiency of’ the Nation. Pub.L. No. 99-503, 100 Stat. 1798, § 2(4). Under § 4 of the Act, the Nation transferred 9,880 acres of reservation land to the United States in return for $30 million and the right to replace the lost reservation acre-for-acre. Id. at §§ 4(a), 6(c). Subject to the requirements and limitations of the Act, the Secretary of the Interior is required to take up to 9,880 acres of land into trust for the benefit of the Nation, effectively making the land part of the Nation’s reservation. Id. at § 6(d).
The Act permits the Nation to use the funds for various purposes, including the purchase of land, and economic and community development. § 6(a).[1] Section 6(c) imposes acreage limits.[2] Section 6(d) establishes that trust land refers to land under subsection (c), and that such land
cannot be taken into trust as reservation land if it is (i) outside certain counties, or (ii) “within the corporate limits of any city or town.”[3]
Over the decades after passage of the Act, the Nation acquired land in Arizona but only one parcel has been taken into trust. Then, in 2003, the Nation purchased the disputed land as part of a 135-acre acquisition. The land is a “county island,” surrounded entirely by the City of Glendale. A county island is unincorporated land surrounded entirely by lands incorporated by the municipality. See Town of Gilbert v. Maricopa Cnty., 213 Ariz. 241, 141 P.3d 416, 418 n. 1 (Ariz.Ct.App.2006) (describing county island).
In 2009, the Nation announced plans to use the land for gaming purposes and filed an application with the Department of the Interior to have the land held in trust under the Gila Bend Act. In response, the City of Glendale sought to annex a portion of the 135 acres. The Nation filed suit in state court challenging the annexation effort.[4] Due to ongoing state litigation, without relinquishing its claim to the full 135 acres, the Nation requested that the Department of the Interior accept into trust only a 54-acre portion of the land not at issue in state court: Parcel 2, the sub *891 ject of this appeal.[5]
II. Prior Proceedings and Decisions
Although the Department of the Interior treated the Nation’s trust application as an ex parte filing, in March 2009, both the City of Glendale and the Gila River Indian Community[6] filed lengthy submissions opposing the trust application. Their submissions argued that Parcel 2 fell “within the corporate limits” of the City of Glendale and was therefore ineligible for trust status under § 6(d) of the Gila Bend Act.
The Secretary of the Interior concluded that the requirements of the Gila Bend Act were met. Specifically, Parcel 2 is wholly within Maricopa County and is outside the City of Glendale’s corporate limits. In considering whether the land qualified for trust status under § 6(d), the Secretary explained that “[t]he Western Regional Director of the BIA, acting under authority of the Secretary, issued a waiver under Section 6(d) ... that allowed the Nation to purchase up to five (5) separate areas of replacement land, rather than three, and further waived the requirement that one of these areas be contiguous to the San Lucy reservation.” In any event, since Parcel 2 is only the second replacement land area to be held in trust under the Act, those waivers do not directly implicate the analysis here. Thus, in accord with the mandate of the Act, the Secretary determined that Parcel 2 must be held in trust for the Nation.
In upholding the Secretary of the Interi- or’s decision, in a careful, comprehensive opinion, the district court concluded that Glendale had waived its argument regarding a total acreage cap under § 6(c) of the Act, because it failed to raise the issue in the administrative proceeding.[7] The district court then deemed the statutory language “within the corporate limits” in § 6(d) to be ambiguous as to county islands like Parcel 2, and concluded that Arizona law was inconclusive. Applying Chevron, the court deferred to the agency’s interpretation of the statute and affirmed the trust decision as “based on a permissible construction of the statute.” See Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Finally, the district court rejected the constitutional arguments under the Tenth Amendment and the Indian Commerce Clause.
‘We review the grant of summary judgment de novo, thus reviewing directly the agency’s action under the Administrative Procedure Act’s (APA) arbitrary and capricious standard.” Gifford Pinchot Task *892 Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1065 (9th Cir.2004).
Analysis
We first consider two questions of statutory interpretation: Whether the Gila Bend Act’s trust land acreage limits are implicated, and whether Parcel 2 is “within” the corporate limits of the City of Glendale. The remaining issues pertain to the limits of congressional power under the Indian Commerce Clause and the Tenth Amendment.[8]
I. The Acreage Limit in Section 6(c)
Section 6(c) of the Gila Bend Act provides that the Nation “is authorized to acquire by purchase private lands in an amount not to exceed, in the aggregate, 9,880 acres.” In turn, the following subsection, 6(d), describes trust land as being land acquired “pursuant to subsection (c).” Before the district court, Glendale argued for the first time that § 6(c) precludes the Nation from acquiring more than 9,880 acres with money from the Act and that the Nation already had exceeded that acreage cap before acquiring Parcel 2. The Nation responds that the cap only applies to land held in trust via § 6(d), and not to land remaining in fee status.
While the Secretary of the Interior did not squarely consider the acreage cap because the issue was never framed as a barrier to taking Parcel 2 in trust, reading the Secretary’s decision in context is telling. In determining whether the § 6(d) trustee requirements were met, the Secretary read the statute as creating a cap on land that could be held in trust under the Gila Bend Act, not as a cap on the total acreage that the Nation could acquire. The Secretary explained the basis of this reading, noting that “[t]he first, and so far only, land acquired in trust for the Nation” was 3,200.53 acres acquired in September 2004. The decision goes on to state that there was another trust application for 3,759.52 acres but that the land was still held in fee. Therefore, the Secretary did not consider land held in fee as relevant to the analysis of the acquisition limitations under the Gila Bend Act. The decision explicitly counts only the fee-to-trust lands, not lands remaining in fee status.
During agency proceedings, the Gila River Indian Community, one of the parties now raising the acreage cap argument, noted, in contrast to its current position, that “[sjection 6(c) limits the number of acres that may be placed into trust to no more than 9,880 acres.” Appellants, including the Gila River Indian Community, now take the opposite position and argue that because the agency proceedings were non-adversarial, the issue should be considered on the merits. The Nation and the government maintain that the acreage cap argument was waived. The ultimate question is one of statutory construction.
Assuming, without deciding, that the argument was not waived, we hold that the statute read as'a whole is unambiguous and that § 6(c) creates a cap only on land held in trust for the Nation, not on total land acquisition by the tribe under the Act.
Our goal is to understand the statute “as a symmetrical and coherent regulatory scheme” and to “fit, if possible, all parts into a harmonious whole.” FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (citations omitted). Section 6(a) authorizes the Nation to use funds received under the Gila Bend Act “for land and *893 water rights acquisition, economic and community development, and relocation costs.” This authorization is broader than land acquisition and does not address trust acreage to replace the Nation’s lost reservation land.
Apart from the general provisions of § 6(a), three provisions of the Act concern the divestment and replacement of reservation land. Section 4 concerns the original 9880-acre reservation, and specifies the conditions under which the Nation would forfeit its “right, title, and interest ... in nine thousand eight hundred and eighty acres of [reservation] land.” Subsections 6(c) and 6(d) provide for the replacement of this precise number of acres of reservation land. Section 6(d) explains the mechanism for restoring reservation land, which requires placing land in trust, and limits the location of reservation land. More specifically, § 6(d) provides:
The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection. Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation for all purposes.
Section 6(c), in turn, limits the size of newly acquired trust land to that of the previous reservation: 9880 acres. Thus, § 6(c) imposes a limit upon the size of land placed in trust for reservation purposes, under § 6(d), rather than upon total land acquisition under § 6(a). Subsection 6(c) and 6(d) are internally cross-referenced and must be read together.
Aside from its inapplicability to non-reservation land, treating § 6(c) as a limit on land acquired under § 6(a) is problematic for other reasons. Congress crafted the Gila Bend Act to allow the Nation substantial autonomy in the use of funds and the acquisition of new reservation land. Because Congress did not expect the Nation to spend the Gila Bend Act funds immediately or all at once, Congress provided that the funds be invested in “interest bearing deposits and securities until expended.” § 6(a). This requirement underscores that Congress did not intend for the tribe to spend a fixed dollar amount, or to spend a specific amount on land, or to acquire the land at any particular time. Rather, the Nation was to have broad discretion in the use of Gila Bend Act funds, and the yield on those funds. The ability to buy land without regard to the cap on trust acreage and then designate the parcels for conversion to trust is well within the “great flexibility” Congress authorized for the Nation. See H.R.Rep. No. 99-851, at 10 (1986) (envisioning the Nation to “have great flexibility in determining the use of funds provided under the Act.”).
Of course, the Nation does not need statutory authorization to acquire and hold land in fee simple. The Nation has the right to buy and sell land just like other persons or entities. Cohen’s Handbook of Federal Indian Law § 15.04(describing various forms of tribal land acquisition, including the purchase of fee simple title). Glendale’s reading would mean that the Gila Bend Act purported to curtail the Nation’s independent right to buy and sell land, an outcome we do not endorse and one that is inconsistent with decades of Indian law.
Further, § 6(b) relieves the Secretary of any audit or oversight responsibility for expenditure of funds under § 6(a): “The Secretary [of the Interior] shall not be responsible for the review, approval, or audit of the use and expenditure” of the replacement land funds. § 6(b). If § 6(a) were cabined by § 6(c), the Secretary would necessarily undertake a monitoring *894 function as to expenditure of money for trust lands, a responsibility specifically disclaimed by the Act.
Finally, as a practical matter, even Glendale’s interpretation would permit the Secretary to accept Parcel 2 in trust. This argument boils down to the view that the first 9,880 acres acquired must go into trust. Nothing in the Act specifies that the lands must go into trust in a chronological order pegged to the time of acquisition. There is no FIFO (first in, first out) principle incorporated in the Act. The Act allows the Nation to replace, acre-for-acre, the 9,880 acres of reservation land it relinquished to federal control under § 4(a). To date, the Secretary of the Interior has taken just one parcel into trust for the Nation, a 3,200 acre parcel known as San Lucy Farms. Acquisition in trust of the 54 acres in Parcel 2 would be the Nation’s second trust acquisition and, after acquisition, the Nation would remain well below the 9,880 acre cap on trust land. That the Nation may have purchased other land is irrelevant to the clear limitation that only 9,880 acres may be held in trust.
Even if the statute were ambiguous, the Secretary of the Interior’s implicit reading of the 9,880 acre limit as a cap on land-to-trust rather than on land acquisition is supported by the text, structure, history, and factual background of the Act. The Supreme Court teaches that courts should “defer to an interpretation which was a necessary presupposition of the [agencyj’s decision.” Nat'l R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 420, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992). The Secretary of the Interior’s implicit interpretation was a reasonable one and enjoys Chevron deference. 467 U.S. at 842-43, 104 S.Ct. 2778.[9]
II. The Corporate Limits Restriction in Section 6(d)
Section 6(d) of the Gila Bend Act prohibits the Secretary of the Interior from taking land into trust “if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town.” (emphasis added). It is undisputed that Parcel 2 is in Maricopa county; the issue is whether Parcel 2, located on a county island fully surrounded by city land, is within the City of Glendale’s corporate limits.
The Arizona appellants contend the phrase “within the corporate limits” should have a geographical meaning: Any land entirely surrounded by a city’s corporate limits is “within” the city. The government argues for a jurisdictional meaning: Any land not subject to a city’s corporate jurisdiction is not “within” the city.[10] Giving the key phrase “within the corporate limits” its plain, natural, and common meaning does not solve the dilemma. United States v. Romo-Romo, 246 F.3d 1272, 1275 (9th Cir.2001) (“[W]e should usually give words their plain, natural, or *895 dinary and commonly understood meanings.”). Here, either reading of the term as used in the statute is plausible, so we conclude that the statute is ambiguous.
In the trust decision, the Secretary opted to analyze the corporate limits restriction based on the jurisdictional nature of fee land rather than its geographical location, and found the term “corporate limits” to have a plain meaning: “The use of ‘corporate limits’ shows a clear intent to make a given piece of property eligible under the [Gila Bend] Act if it is on the unincorporated side of the city’s boundary line.” The Secretary reasoned that, had Congress intended to exclude county islands from possible trust acquisition, it could have done so by using language such as “exterior boundary,” “within one mile of any city” or “city limits.” Congress knows how to use the phrase “exterior boundaries” when it intends to include jurisdictional “islands” within another entity’s borders. See, e.g., 16 U.S.C. § 485 (Secretary of Agriculture may accept “title to any lands within the exterior boundaries of the national forests”); 25 U.S.C. § 465 (certain funds may not be “used to acquire additional land outside of the exterior boundaries of the Navajo Indian Reservation”). Significantly, the trust decision also considered the possibility that the language was ambiguous. The Secretary concluded, in the alternative, that “[e]ven if Congress’s intent was less clear ... we interpret the term not to support a conclusion that Parcel 2 is ineligible under the Act, with or without consideration of the [Indian] canon.”
We defer to the agency’s interpretation as long as it is a reasonable one. Chevron, 467 U.S. at 842-48, 104 S.Ct. 2778. The Supreme Court has clarified that where an agency interpretation is reasonable, courts may invoke Chevron step two at the outset to uphold the agency decision. See Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 218, 129 S.Ct. 1498, 173 L.Ed.2d 369 (2009). In considering an Environmental Protection Agency final rule, the Court in Entergy Corp. explained that the presumption of deference to a reasonable agency opinion applies at the outset of the reviewing court’s analysis: “[W]e invoke this proposition (that a reasonable agency interpretation prevails) at the outset, omitting the supposedly prior inquiry of whether Congress has directly spoken to the precise question at issue____ [S]urely if Congress has directly spoken to an issue then any agency interpretation contradicting what Congress has said would be unreasonable.” Id. at 218 n. 4, 129 S.Ct. 1498 (internal quotations and citations omitted).
The fact that the Secretary of the Interi- or found the statute to be clear and unambiguous is of no moment and does not undermine the scope of our deference. Not only did the Secretary exercise his judgment and discretion on that point, he affirmatively considered and invoked his expertise on an alternate basis, construing the statute as ambiguous.[11] See Local Union 1261, United Mine Workers of Am. v. FMSHRC, 917 F.2d 42, 47 (D.C.Cir.1990) (upholding agency’s interpretation at Chevron step two even where the court disagreed with the agency’s conclusion that the meaning of the statute was “plain” because the agency reasonably construed the statute and “exercise[d] its discretion in interpreting the statutory scheme in light of its policy judgment and expertise.”). Chevron *896 deference is based, in part, on the “long recognized [principle] that considerable weight should be accorded to an executive department’s construction of a statutory scheme it is entrusted to administer.” Chevron, 467 U.S. at 844, 104 S.Ct. 2778. Here, the agency entrusted to administer the Gila Bend Act faced an issue of pure statutory interpretation, carefully considered alternative approaches in construing the statutory scheme, and reached a reasonable interpretation.
The Secretary’s construction of § 6(d) is consistent with congressional intent and the structure of the statute itself, and is supported by the City of Glendale’s laws and conduct, and Arizona state law. By precluding the Nation from obtaining in trust land within a city’s jurisdiction, Congress took a step to protect municipal interests. The Act protects cities from losing territory over which they exercise authority and from which they generate tax revenue once the Nation obtains such land. But this protection only applies to land actually incorporated by a city or town. When a city surrounds a county island, there are two relevant boundaries: The city’s exterior boundary and the interior boundary between the city and the county island. Both of these boundaries are corporate limits, because both divide incorporated city land from unincorporated county land. Only land that is between the inner and outer corporate boundaries, incorporated land is “within” the city’s “corporate limits.” Even under the Arizona appellants’ reading, nothing would prevent the Secretary from holding in trust for the Nation land immediately adjacent to a city’s outermost boundary, or even an octagonally shaped parcel that was encircled by corporate land on seven of its eight sides. A county island is no different in principle or practice. Finally, the Secretary’s interpretation gives meaning to the term “corporate” as part of the phrase “within the corporate limits” and also avoids the sovereignty issues raised by the dissent.
The trust decision discusses in detail the Secretary’s consideration of city and state provisions affecting county islands. In practice, Glendale’s own local treatment of county islands strongly supports the Secretary’s view that county islands are not “within the corporate limits.” The City of Glendale does not treat county islands as falling within its control: County islands are not assessed municipal tax and receive no municipal services.
Until this litigation, the City of Glendale characterized county islands as lying outside its corporate limits and requiring annexation to be included within the City’s limits. For example, when the City of Glendale incorporated a strip of land that surrounds Parcel 2 and other unincorporated territory, the annexation ordinance provided that “the present corporate limits [are] extended and increased to include” only the strip of land precisely described with metes and bounds. City of Glendale, AZ, Ordinance 986 New Series, (July 26, 1977). Similarly, numerous City of Glendale annexation ordinances addressing county islands use the language “located within an existing county island” and confirm that as a result of the annexation, the newly annexed county island land is “to be included within the corporate limits of the City of Glendale.” See, e.g., City of Glendale, AZ, Ordinance 2693 New Series, (Sept. 23, 2009); City of Glendale, AZ, Ordinance 2674 New Series, (Mar. 18, 2009); City of Glendale, AZ, Ordinance 2668 New Series, (Mar. 11, 2009).
As the Secretary observed, Arizona statutes also refer to county islands as falling *897 outside corporate limits.[12] See, e.g., Ariz. Rev.Stat. Ann. § 9-500.23(authorizing a city to “provide fire and emergency medical services outside its corporate limits to a county island.”). Finally, the Secretary considered an Arizona Supreme Court case that Glendale relies on heavily in this appeal. In Flagstaff Vending Co. v. City of Flagstaff, the Arizona Supreme Court held that Northern Arizona University is “within” the city limits of Flagstaff for the purposes of local tax ordinances. 118 Ariz. 556, 578 P.2d 985, 987 (1978). However, that case is not instructive in interpreting § 6(d) or the land configuration of Parcel 2.
To begin, Flagstaff did not consider a county island. Rather, the land in question had undisputedly been incorporated by the city. The issue was whether a municipal tax could extend to activity conducted on a university campus owned by the state. For that limited question, the record did “not make it clear whether the campus of Northern Arizona University [was] part of the City of Flagstaff.” Id. at 990(Cameron, C.J., concurring). The record did make clear, however, that unlike Parcel 2 the campus received services from the city. Id. at 989. Finally, the ordinances at issue referred primarily to the phrases “within this city,” “without the city” and on one occasion “without the corporate limits” of the city. The term “within the corporate limits of any city or town” does not appear and was not construed. The Flagstaff opinion, like the ordinances, appears to use without precision or definition the various terms referring to city boundaries. In the end, the issue of statutory interpretation may not be crystal clear but the outcome is made easy by our adherence to Chevron deference, and the Secretary’s reasonable interpretation.[13]
We are puzzled by the dissent’s invocation of the clear statement rule. To begin, in the nine briefs filed with the court, it is no surprise that not a single brief referenced this argument.[14] It is also telling that no party argued that the Secretary’s construction of § 6(d), in particular, raised serious constitutional problems or implicated state sovereignty. Arizona appellants’ effort at oral argument to reframe the rule to one of constitutional avoidance is unavailing because § 6(d) does not implicate constitutional sovereignty concerns. Not only is this recharacterization of the claim an eleventh hour effort to change gears, but this canon of construction does not bear on our interpretation of the Gila Bend Act.
The clear statement rule, which is a canon of statutory construction, not a rule of constitutional law, applies where courts “confront[] a statute susceptible of two plausible interpretations, one of which ... alter[s] the existing balance of federal and state powers.” Salinas v. United States, 522 U.S. 52, 59, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); see also Hilton v. South Carolina Pub. Rys. Comm’n, 502 U.S. 197, 205-06, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) (distinguishing between a rule of constitutional law and a rule of statutory *898 construction and using the plain statement rule as an example of a rule of statutory-construction).
Neither the dissent nor the Arizona appellants have articulated a state sovereignty or constitutional interest vis-a-vis § 6(d). Whatever our interpretation of the phrase “within the corporate limits of any city or town,” it does not raise a question of federal encroachment on state power. In short, the Gila Bend Act does not implicate an “existing balance of federal and state powers.” In Gregory, the Court does not indicate that the clear statement rule applies to any and all regulation of state governmental functions. Justice White, in his partial concurrence, partial dissent in Gregory raises this issue explicitly: “The majority’s approach is also unsound because it will serve only to confuse the law. First, the majority fails to explain the scope of its rule____ Second, the majority does not explain its requirement that Congress’ intent to regulate a particular state activity be ‘plain to anyone reading [the federal statute].’ ” 501 U.S. at 478, 111 S.Ct. 2895. Virtually any federal legislation could be construed to have at least minor, derivative implications for traditional state functions. For example, does federal legislation appropriating funds for building and maintaining interstate highways require a plain statement of Congressional intent to interfere with the traditional state functions of zoning and land use that the dissent flags in this case? The plain statement rule should not be applied in a way that makes it into a useless tautology. To the extent one is searching for a clear statement, Congress was clear: The Nation is entitled to swap out 9,880 acres of trust land ceded to the federal government for land of equivalent total acreage. This swap does not implicate state interests nor can Arizona appellants seriously argue that state sovereign interests restrict the Secretary from establishing a reservation on trust land.[15] As we know, “[s]tate sovereignty does not end at a reservation’s border.” Nevada v. Hicks, 533 U.S. 353, 361, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). See also Surplus Trading Co. v. Cook, 281 U.S. 647, 651, 50 S.Ct. 455, 74 L.Ed. 1091 (1930) (citing Indian reservations as examples of federally managed land within state territory).
Even under the dissent’s reading of the statute, nothing would prevent the Nation from acquiring land in trust immediately adjacent to a city’s outermost boundary or even land that was almost, but not entirely encircled by corporate land. This circumstance is not one in which “an administrative interpretation of a statute invokes the outer limits of Congress’ power.” Solid Waste Agency of N. Cook County v. U.S. Army Corps of Engineers, 531 U.S. 159, 172, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001). Neither plausible construction of the statute “raise[s] serious constitutional problems” that counsel invocation of the clear statement rule. Id. The dissent’s real concern about a casino abutting the City of Glendale is revealed in its effort to transform statutory interpretation of a federal trust land provision into a blocking effort by the city. At this stage, no one knows whether a casino will be approved. The Nation faces regulatory and court battles that are beyond the scope of this appeal. To convert this issue from one of Chevron deference to a sovereignty battle over reg *899 ulation of Indian gaming distorts the clear statement rule.
III. The Indian Commerce Clause and the Tenth Amendment
The final issue is the claim that the Gila Bend Act exceeds Congress’s power under the Indian Commerce Clause and violates the Tenth Amendment. In rejecting this argument, the district court noted that “counsel for Glendale agreed during oral argument [that] Plaintiffs ask the Court to break new ground on this issue— to depart from every court decision that has previously addressed it.” See, e.g., Carcieri v. Kempthorne, 497 F.3d 15, 39-40 (1st Cir.2007) (en banc), rev’d on other grounds, 555 U.S. 379, 129 S.Ct. 1058, 172 L.Ed.2d 791 (2009) (emphasizing that powers expressly delegated to Congress do not implicate the Tenth Amendment, and that “[b]ecause Congress has plenary authority to regulate Indian affairs, [the challenged act] does not offend the Tenth Amendment.”). On appeal, the Arizona appellants offer no such acknowledgment. The gist of their argument is that the Gila Bend Act infringes on Arizona’s sovereignty. Their effort to invoke Seminole Tribe of Florida v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), which considered the Eleventh Amendment’s express grant of state sovereign immunity, is unpersuasive and fails in the face of the broad powers delegated to Congress under the Indian Commerce Clause. U.S. Const. art. I, § 8, cl. 3.
The Tenth Amendment provides that “powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.” U.S. Const. amend. X. The Supreme Court has read this Amendment as a “tautology”: “If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States.” New York v. United States, 505 U.S. 144, 156-57, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). The question here is straightforward: Did Congress act within its powers under the Indian Commerce Clause in passing the Gila Bend Act? If so, the Tenth Amendment is not implicated, and the constitutional challenge fails.
The Indian Commerce Clause empowers Congress “[t]o regulate Commerce ... with the Indian Tribes.” U.S. Const. art. I, § 8, cl. 3. The Supreme Court has interpreted this clause broadly: “the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs.” Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989). That “Indian relations [are] the exclusive province of federal law” is beyond dispute. Cnty. of Oneida v. Oneida Indian Nation of New York State, 470 U.S. 226, 234, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). See also Morton v. Mancari, 417 U.S. 535, 552, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (holding that the Indian Commerce Clause empowers Congress to “singlet ] Indians out as a proper subject for separate legislation.”).
In passing the Gila Bend Act, Congress acted within its authority and expressly stated that it was fulfilling “its responsibility to exercise plenary power over Indian affairs to find alternative land for the [Nation].” H.R. Rep. 99-851 at 7. As we learned from Garcia v. San Antonio Metro. Transit Auth., courts “have no license to employ freestanding conceptions of state sovereignty when measuring congressional authority under” a constitutionally enumerated power. 469 U.S. 528, 550, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). Passage of the Gila Bend Act was well within congressional power under the Indi *900 an Commerce Clause and is not trumped by the Tenth Amendment.
AFFIRMED.

. "The Tribe shall invest sums received under section 4 in interest bearing deposits and securities until expended. The ... [Nation] may spend the principal and the interest and dividends accruing on such sums ... for land and water rights acquisition, economic and community development, and relocation costs.” § 6(a).

. "The Tribe is authorized to acquire by purchase private lands in an amount not to exceed, in the aggregate, nine thousand eight hundred and eighty acres.” § 6(c).

. "The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection. Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation for all purposes. Land does not meet the requirements of this subsection if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town.” § 6(d).

.The Nation ultimately prevailed on appeal. See Tohono O’odham Nation v. City of Glendale, 227 Ariz. 113, 253 P.3d 632 (Ariz.Ct. App.2011), petition for review denied Oct. 25, 2011.

.The dissent recounts various facts at length to provide, in its view, "the rest of the stoiy.” In effect, the dissent along with the parties opposing the trust designation, infuse the appeal with the Nation’s economic motives and plans for Indian gaming on the trust land. But those issues are not on appeal. We do not and are not called upon to express an opinion as to the availability of the trust land for use as a casino. That question is tied up in other litigation and the legislation that recently passed the House of Representatives. See Gila Bend Indian Reservation Lands Replacement Clarification Act. H.R. REP. No. 112-440 (2012). This issue does not bear on our interpretation of the Gila Bend Act.

. The Gila River Indian Community is a separate tribe whose gaming interests are implicated by the Nation’s plans to develop a casino on Parcel 2.

. We note that, according to the Secretary, the normal "notice and comment provisions of 25 C.F.R. §§ 151.10 and 151.11(d), requiring that the BIA [Bureau of Indian Affairs] notify state and local governments of the land-into-trust application, are not applicable” to this transaction.

. The Gila River Indian Community and the Terry and Rios appellants appeal only as to the acreage issue. The City of Glendale and the various Arizona appellants (collectively "Arizona appellants”) appeal as to all of the issues.

. The Nation also argues that the Department of the Interior’s trust decision is compelled by the Indian Canon which requires that when there is doubt as to the proper interpretation of an ambiguous provision in a federal statute enacted for the benefit of an Indian tribe, "the doubt [will] benefit the Tribe.” (quoting Artichoke Joe’s Cal. Grand Casino v. Norton, 353 F.3d 712, 729 (9th Cir.2003)). Because we affirm on alternate grounds, we need not reach this argument or the Gila River Indian Community’s claim that the canon is inapplicable when there are competing tribal interests.

. The dissent’s suggestion that the government took a differing view in prior litigation is not borne out by the record. In totally unrelated litigation the government made passing reference to geographical restrictions on trust land. But, in doing so, the brief did not consider the distinction under § 6(d) nor was this section at issue in the litigation.

. The dissent takes the view that § 6(d) is not ambiguous but surprisingly comes to an interpretation at odds with the Secretary. Were we to go that route, we would agree with the Secretary — the "corporate limits” restriction means property is eligible for trust status "if it is on the unincorporated side of the city’s boundary line.”

.Although Arizona appellants cite other Arizona and out-of-state authorities that suggest an alternate reading, Chevron deference requires that the agency interpretation be permissible, not the only plausible construction. See Entergy Corp., 556 U.S. at 218, 129 S.Ct. 1498.

. As with the acreage cap issue under § 6(c), because we affirm under Chevron, we need not consider the alternative basis of the Indian Canon of construction.

. In an order from the panel after briefing and just before argument, the parties were asked to discuss the clear statement rule at oral argument.

. To the extent the Arizona appellants argue that the Gila Bend Act impermissibly interferes with the state’s interest in maintaining its taxable land base, the text of the Act provides a definitive answer: "With respect to any private land acquired by the Tribe under section 6 and held in trust by the Secretary, the Secretary shall make payments to the State of Arizona and its political subdivisions in lieu of real property taxes.” § 7(a).